Klima Unemployment Compensation Case.
Mackintosh-Hemphill Division, E. W. Bliss
Company, Appellant, v. Unemployment
Compensation Board of Review.

Argued April 14, 1965. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (FLOOD, J., absent).

*Donald C. Bush,* with him *Griggs, Moreland, Blair* and *Douglass,* for employer, appellant.

*Sydney Reuben,* Assistant Attorney General, for Unemployment Compensation Board of Review, appellee.

*Jerome H. Gerber,* with him *Sidney G. Handler,* for intervening appellees.

OPINION BY WATKINS, J., June 17, 1965:

In this unemployment compensation case the Unemployment Compensation Board of Review awarded benefits to the claimants, employees of the appellant, Mackintosh-Hemphill Division, E. W. Bliss Company, on the ground that their unemployment was the result of a work stoppage for which the employer was primarily responsible under §402(d) of the Unemployment Compensation Law, 43 PS §802(d).

The case involves benefits for a number of employees who had become unemployed as a result of a dispute concerning a new labor contract between the appellant and the union representative of the claimants. The parties have stipulated that the rights of all claimants involved will be governed by the decision in the case of one of the claimant-employees, John J. Klima.

At the outset we should dispose of the complaints of the employer regarding the procedural aspects of this case, keeping in mind that "its benefits and objectives shall not be frittered away by slavish adherence to technical and artificial rules." *Baigis Unemployment Compensation Case,* 160 Pa. Superior Ct. 379, 51 A. 2d 518 (1947).

The Bureau of Employment Security held the defendants ineligible for benefits in that their unemployment was due to a labor dispute. On appeal the case was assigned for hearing to Referee John F. Curran.

After holding hearings and prior to decision the referee died. Referee Sanford M. Lampl was then assigned to hear the case de novo. The claimants requested that it be held de novo. The notice to the parties read: "Notice of hearing on original Appeal", the appeal from the Bureau. The referee, treating it as a de novo hearing, refused to admit into evidence the record of the prior Curran hearing, but permitted the use of the record for cross-examination purposes. All the witnesses that testified in the Curran hearing were present at all subsequent hearings and all documents introduced in the Curran hearing were available at the subsequent hearings. The record of the Curran hearing was used for cross-examination purposes.

After hearing, Referee Lampl sustained the appeal from the Bureau and awarded benefits on the theory that their unemployment was the result of a lock-out by the employer. The employer appealed to the Unemployment Compensation Board of Review and requested a further hearing for the purpose of submitting additional testimony. When such a request is made the Board appoints a referee to hear the additional testimony. The Board issued a remand order and appointed Referee Edward Solomon, Jr. to hear the additional testimony. The notice read: "Hearing on Board Appeal", to distinguish it from the decisional hearing. Referee Solomon was sitting as a hearing officer for the Board: §502 of the Unemployment Compensation Law, 43 PS §822. The Board and not the referee then makes the decision.

After the Board hearing in this case, the matter was argued before the Board and the Board affirmed the decision of Referee Lampl. The employer sought reconsideration. The decision was vacated and reargument scheduled. After reargument the Board reinstated its decision affirming the referee.

We are unable to see how the employer was prejudiced in any way under the procedural history of this case. The Unemployment Compensation authorities gave the employer every possible opportunity to properly present its defense. Testimony given in a former proceeding is admissible in a subsequent proceeding if certain conditions are met. These are: (1) the witness is dead; (2) is out of the jurisdiction; (3) cannot be found; or (4) is sick or insane. Henry Pennsylvania Evidence, Vol. I, §480, page 486. None of these factors exist here. As already set forth all the witnesses were present at all the hearings. The ruling excluding the introduction of the Curran record but permitting its use for cross-examination purposes was proper and did not in any way prejudice this appellant.

However, we are not deciding that it would have been error for another referee to have held additional hearings and then dispose of the case by decision on the entire record, despite the fact that he did not see and hear the witnesses that testified before the deceased referee. We are deciding that under the circumstances of this case the de novo hearing was preferable for both sides and that the employer was not prejudiced by it. It is certainly much better if the decision writer had the opportunity of seeing and hearing the witnesses in disposing of matters of credibility but in the administration of workmen's compensation and unemployment compensation the ultimate fact finder, the Board, in most cases never sees or hears the witnesses but must make the final decision, including the determination of credibility. In these cases the delegation of the hearing power has been given to referees. *Foley Bros., Inc. v. Commonwealth,* 400 Pa. 584, 163 A. 2d 80 (1960). In divorce cases the Superior Court of Pennsylvania hears appeals de novo and must dispose of the question of credibility, purely on the cold record of the testimony taken before a master.

494

The claimants are members of the United Steelworkers of America, Local Union No. 1269. The company and the union had entered into a written collective bargaining agreement which was to expire on July 31, 1962. Sixty days prior to the expiration of the contract the employer notified the union of its desire to terminate the collective bargaining agreement. Negotiations began on or about June 20. The contract which was to expire July 31, 1962 had a provision in it calling for the implementation of what is known as a Co-operative Wage Scale program upon which the union puts great value. The program, during the existence of the old contract, although an integral part of it, had never been implemented.

At any rate the parties reached an impasse as negotiations reached the contract deadline and an industrial dispute closed the plant as of August 1, 1962. The Unemployment Compensation Board of Review made the following pertinent findings of fact:

"7. One of the principal issues separating the Company and the Union was the problem of C.W.S. (Co-operative Wage Scale). Although the issue of C.W.S. was written into the labor-management agreement of January, 1960, it was not to become effective until the job descriptions had been agreed to between the Union and the Company.

"8. From January of 1960 until notice of renegotiation of contract was given prior to June 1, 1962, no agreement had been arrived at between the Union and the Company as to job descriptions under C.W.S.

"9. Meetings were held between June 1 and July 31, 1962, for the purpose of resolving the C.W.S. problem, job descriptions and many other issues, both economic and non-economic.

"10. When it became apparent that no agreement could be arrived at, the Company proposed to extend the existing contract for a period of nine (9) days.

During these nine days the only subject the Company was willing to negotiate was C.W.S.

"11. The Union proposed to extend the existing contract for either 30, 60 or 90 days, as might be required, and to negotiate all disputed provisions of the entire contract.

"12. When the Union made this proposal on July 31, 1962, the Company broke off negotiations although there were ten hours left before the midnight deadline.

"13. The Company was not willing to negotiate the entire contract, but was willing only to negotiate on C.W.S. provisions.

"14. An industrial dispute closed the plant as of August 1, 1962.

"15. Although an industrial dispute began on August 1, 1962, the employes were not immediately unemployed as a result of the industrial dispute because plant-wide vacations had been scheduled from August 1 to August 13, 1962.

"16. The Union was ready, willing and able to return to work after the vacation period by extending the contract, but was prevented from doing so by the employer."

The above findings of fact are supported by competent evidence and are binding on this Court. Section 402 (d) reads as follows: "An employe shall be ineligible for compensation for any week— . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory, establishment or other premises at which he is or was last employed: . . .". The Board concluded that under the above facts the work stoppage was the responsibility of the employer and constituted a lock-out under the Unemployment Compensation Law.

The Unemployment Compensation Law recognizes the legality of a strike called by a union or a lock-out declared by an employer. Both of these devices are

legal weapons for use in collective bargaining. *National Labor Relations Board v. Brown*, 380 U. S. 278, 85 S. Ct. 980 (1965); *American Ship Building Co. v. NLRB*, 380 U. S. 300, 85 S. Ct. 955 (1965). But it is the duty of the Unemployment Compensation authorities to determine the causal factors of the work stoppage. If it is determined that a strike by the union caused the stoppage, the employees are not entitled to benefits. If it is determined that the work stoppage was the responsibility of the employer, a lock-out, the employees are entitled to benefits.

If the employees offer to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage, pending further negotiations looking toward a final settlement of the contractual negotiations, there is no disqualifying strike. *Vrotney Unemployment Compensation Case, Erie Forge & Steel Corp. v. Unemployment Compensation Board of Review*, 400 Pa. 440, 163 A. 2d 91 (1960); *Leto Unemployment Compensation Case*, 176 Pa. Superior Ct. 9, 106 A. 2d 652 (1954); *Hogan Unemployment Compensation Case*, 169 Pa. Superior Ct. 554, 83 A. 2d 386 (1951); *McGinnis Unemployment Compensation Case*, 184 Pa. Superior Ct. 95, 132 A. 2d 749 (1957). It has long been established that it is the duty of the compensation authorities to ascertain the final cause and responsibility for the work stoppage. *McGinnis Unemployment Compensation Case*, supra, at page 101.

In a much closer case on the facts than the instant one the Supreme Court in the *Erie Forge* case, supra, reversed the decision of this Court, as reported at 188 Pa. Superior Ct. 405, 146 A. 2d 751 (1958), that held the employees ineligible and found that the facts supported the legal conclusion of a lock-out. The Supreme Court in that case clearly fixed the law to be that:

"In the very delicate and sensitive negotiations which are involved in the development of a new collective bargaining agreement to replace one that is nearing its expiration, all parties must be sincere in their desire to maintain the continued operation of the employer's enterprise. The law contemplates that collective bargaining will be conducted in good faith, with a sincere purpose to find a basis for agreement. Neither an adamant attitude of 'no contract, no work' on the part of the employees, nor an ultimatum laid down by the employer that work will be available only on his (employer's) terms, are serious manifestations of a desire to continue the operation of the enterprise. While either or both of these positions may legitimately be taken by the parties during the bargaining negotiations prior to the expiration of the existing contract, when the contract has in fact expired and a new agreement has not yet been negotiated, the sole test under §402(d) of the Unemployment Compensation Law, . . . (Citation of Acts), of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' and the disqualification for unemployment compensation benefits in the case of a 'stoppage of work because of a labor dispute' does not apply."

Under the facts as found in this case the application of the law is governed by the *Erie Forge* case.

The refusal of the employer to accept the extension of the terms under the old contract made by the union for 30, 60 or 90 days while negotiating a new contract and the employer's counteroffer of a 9-day extension, and then only to consider the Co-operative Wage Scale, was unreasonable and amounted to a refusal to extend the contract under present terms for further negotiations so that the work stoppage that resulted constituted a lock-out.

Decision affirmed.