Bokoski Unemployment Compensation Case.
Lee National Corporation, Appellant, *v.*
Unemployment Compensation Board
of Review.

98

Argued March 18, 1965. Before ERVIN, P.J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, and HOFFMAN, JJ. (FLOOD, J., absent).

*George A. Burnstein*, with him *Kleinbard, Bell & Brecker*, for employer, appellant.

*Sydney Reuben*, Assistant Attorney General, with him *Raymond Kleiman*, Deputy Attorney General, and *Walter E. Alessandroni*, Attorney General, for Unemployment Compensation Board of Review, appellee.

OPINION BY HOFFMAN, J., June 17, 1965:

This is an appeal by an employer from a determination by the Unemployment Compensation Board of Review allowing benefits to claimant. The Bureau of Employment Security, the referee and the Board all determined that claimant is entitled to benefits because his unemployment resulted from a work stoppage which constituted a lockout.

Claimant, Richard Bokoski, was an employee of appellant, Lee National Corporation,[1] and a member of Local No. 227, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL-CIO.[2] The union and appellant executed a collective bargaining agreement effective June 30, 1961. Its expiration date was June 30, 1963. Pursuant to the terms of this contract, appellant, on April 18, 1963, and the union, on April 29, 1963, notified each other of their desire to negotiate a new agreement. Although several sessions were held prior to June 30, no new agreement was executed. The union, therefore, instructed its members to report for work on July 1, 1963, and on a day to day basis so long as appellant continued to operate under the terms of the expired contract. On July 16, 1963 the company submitted a letter to the union stating that operations of the Lee Division under the terms and conditions of the expired contract would not be continued. The letter also said that new terms and conditions would be effective on July 18.[3] The union rejected the new terms, but proposed to continue working under the expired contract. The union also informed the employer of its availability for further negotiations. Appellant displayed no interest in the union's proposal, and additional negotiations were not held until July 30, 1963. Claimant and his fellow-

---

[1] Lee National Corporation is also known as Lee Rubber and Tire Corporation. Claimant worked at its plant in Conshohocken, Pennsylvania.

[2] It has been stipulated that the pertinent facts relating to the claim of Richard Bokoski apply to all employees of appellant who are claiming benefits. Disposition of the present appeal will determine, therefore, all of the claims involved.

[3] The new terms included a 20% wage reduction, a job evaluation program, modification of seniority provisions, a loss of one holiday, and a discontinuance of any further contribution to the company's supplemental unemployment benefit fund.

employees did not report for work on July 16, 1963, and, thereafter, operations in the plant ceased.

The Unemployment Compensation Law provides:

"An employe shall be ineligible for compensation for any week— . . . (d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (*other than a lock-out*) at the factory, establishment, or other premises at which he is or was last employed. . . ." Act of December 5, 1936, P. L. (1937) 2897, art. IV, §402; as amended by the Act of June 20, 1939, P. L. 458, §2; Act of April 23, 1942, P. L. 60, §4; Act of May 21, 1943, P. L. 337, §1; Act of May 29, 1945, P. L. 1145, §9; Act of June 30, 1947, P. L. 1186, §2; Act of May 23, 1949, P. L. 1738, §11; Act of August 24, 1953, P. L. 1397, §4; Act of March 30, 1955, P. L. 6, No. 5, §5; Act of December 17, 1959, P. L. 1893, §§8, 9, 10, 43 P.S. §802.

It is settled law that the responsibility for a work stoppage is assessed against the party whose actions constituted the final cause thereof, and it is the duty of the compensation authorities to ascertain the final cause and responsibility. *Irvin Unemployment Compensation Case*, 198 Pa. Superior Ct. 308, 312, 181 A. 2d 854, 857 (1962). The applicable test was stated in *Vrotney Unemployment Compensation Case*, 400 Pa. 440, at 444, 163 A. 2d 91, at 93-94 (1960):

"[A]ll parties must be sincere in their desire to maintain the continued operation of the employer's enterprise . . . Neither an adamant attitude of 'no contract, no work' on the part of the employees, nor an ultimatum laid down by the employer that work will be available only on his (employer's) terms are serious manifestations of a desire to continue the operation of the enterprise. While either or both of these positions may legitimately be taken by the parties during the bargaining negotiations prior to the expiration of the existing contract when the contract has in fact

expired and a new agreement has not yet been negotiated, the sole test under section 402(d) of the Unemployment Compensation Law . . . of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' . . ."

In the present case, the Board made the following significant findings:

"19. The Company, prior to the negotiating meeting of July 16, 1963, submitted a prepared letter to the Union, and also, on the same date sent by registered mail a copy of this letter to the Union. The Company disclosed its position in this letter, which provided in part as follows:

" 'Since the Company and the Union apparently have reached a deadlock for the time being regarding the key issues which have been intensively negotiated to date, despite the various amendments and concessions made by the Company from its original proposals, we see no basis on which we can continue any further the operations of the Lee Division on a day-to-day basis under the terms and conditions of the working agreement and the Supplemental Unemployment Benefits Agreement, both of which have expired on June 30, 1963 . . . .

" 'We are accordingly notifying you that effective as of operations on Thursday, July 18, 1963, the Company shall discontinue applying the terms of the ex-

pired Agreement and Sub-Agreement, and, shall put into effect certain designated terms of employment contained in the Company's proposals as amended to date during negotiations.'

"20. The new terms and conditions referred to in the Company's letter of July 16, 1963, which were to be effective 7:00 a.m., July 18, 1963, included in part the following:

"a. A 20% wage reduction in all hourly and piece work rates.

"b. Job evaluation program.

"c. Modification in seniority provisions.

"d. Loss of one holiday.

"e. Discontinuance of any further contribution to the Company's Supplemental Unemployment Benefit Fund.

"21. The Union, at the negotiation meeting of July 16, 1963, informed the Company of its readiness and willingness to continue working under the same terms and conditions of employment, which existed prior to the expiration of the bargaining agreement on June 30, 1963. The Company informed the Union that it was not interested in this proposal.

"22. The Union took the Company's ultimatum, as indicated in its letter of July 16, 1963, under advisement and a vote was taken to stop working and not accept the Company's ultimatum to work under the conditions presented to the Union.

"23. The Union notified the Company on July 16, 1963, at approximately 2:00 P.M. that it would not accept the Company's ultimatum. On the same day, the Union again informed the Company of its readiness and willingness to continue working under the same terms and conditions of employment, which existed prior to the expiration of the bargaining agreement on June 30, 1963, and to continue its availability for further negotiations. The Company was not interested

in the Union's proposal and the next negotiation was not held until July 30, 1963." These findings are supported by the evidence which appears in the record.[4]

On the basis of these findings of fact, the Board quite properly concluded, ". . . that the Company was adamant in its ultimatum to the claimant and fellow-employees requiring them to work on July 18, 1963 and thereafter only on the Company's terms but not under the pre-existing terms and conditions of the employment pending further negotiations; and that, on the other hand, the claimant and his fellow-employees offered to continue working under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the Agreement negotiations." (Record 467a).

Appellant's principal contention is that the Board erred in refusing to evaluate the employer's economic condition before fixing responsibility for the work stoppage. It argues that an employer need not bear the burden of the onerous terms of an expired labor contract indefinitely; that its sole obligation is to permit

---

[4] See Record pages 444a-451a. The testimony of the President of the Union is significant:

"Q. Did he say this, as quoted in the minutes: 'As you know fellows, we went to a meeting with the Board of Directors that was called in regards to labor negotiations. We are no longer working on a day to day basis after July 18, 1963' and did Mr. Conway announce that all conditions were going into effect were subject to change from time to time? A. Yes, he did. Q. And that included the reduction of 20% in wages? A. Right. Q. And did you advise the Company that you were willing to work under the terms of the old agreement until you reached a new agreement? A. The last thing I did on July 16th before we went to the union hall, I told the Company we are willing to work under the old agreement until we get a new agreement. Q. Did the Company answer they were not willing to work under these conditions? A. That's right. Q. And were you subsequently advised by Mr. Conway that the decision to institute these changes was a decision of the Board of Directors? A. That's right." (Record 319a)

work to continue for a reasonable time pending further negotiations; and that the Board must make findings with respect to the financial situation of the employer before determining if a reasonable time has elapsed. Appellant would have the Board consider whether the business of the employer is profitable or not, and whether the employer's economic difficulties compel the imposition of new terms and conditions of employment.[5]

It is well established that such an economic evaluation is beyond the scope of unemployment compensation authorities. In *Leto Unemployment Compensation Case,* 176 Pa. Superior Ct. 9, 16, 106 A. 2d 652, 655 (1954), we said:

"So here, that depressed business conditions required P. McGraw Wool Company to seek wage reductions and modified work assignments is not a factor in the search for the final cause of the work stoppage. Labor is only one item of the cost of production. If an employer contends that it must reduce wages, would it not be necessary for the compensation authorities to examine all the other items which go to make up the cost of production to ascertain whether a wage reduction is justified? Such a task is obviously beyond the

---

[5] In its brief appellant states:

"A reasonable time in one situation cannot, of necessity, constitute a reasonable time in another. For example, an employer operating a profitable business and finding himself in a stalemate with his union concerning new terms and conditions of employment may well act unreasonably if he, sixteen days following the expiration of the old collective bargaining agreement, abruptly institutes new terms and conditions of employment on a unilateral basis.

"Similarly, an employer suffering minimal losses or short-term economic difficulties might well be deemed to have acted unreasonably if, only a short period following the expiration of the Old Labor Agreement, he instituted new terms and conditions of employment . . ."

ability and facilities of the administrative agency." To hold that the economic condition of the employer is a factor in determining whether a reasonable time has elapsed would plunge the Board into an area of complex financial problems and determinations which are beyond its competence.[6] We hold, therefore, that the Board correctly refused to embark upon an investigation of the financial condition of the company in its search for the final cause of the work stoppage.

Appellant also argues that the Board erred in not finding that the union's rejection of appellant's offer on June 28, 1963, to extend the expired contract for seven working days was a contributing cause of the work stoppage. The Board's duty, however, is to ascertain the *final cause* of such stoppage. *Irvin Unemployment Compensation Case, supra.* Thus, the Board's refusal to attach significance to the union's rejection of the employer's offer may be explained in part by the fact that the rejection occurred more than two weeks before the work stoppage. Furthermore, the company informed the union that the plant would be open on a day-to-day basis under the terms of the expiring contract, even if the proposed extension agreement were rejected. (Record 417a). Therefore, although the union rejected this proposal, it did so knowing that it was acceptable to permit work to continue on a day-to-day basis. (Record 418a).

Appellant's reliance on *Lerch Unemployment Compensation Case,* 400 Pa. 446, 451, 163 A. 2d 535, 537 (1960), is misplaced. The evidence there, clearly es-

---

[6] Similarly in *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 561, 83 A. 2d 386, 390 (1951), we said:

"For the Board to attempt to settle the reasonableness of offers or demands would involve a consideration of economic problems beyond the scope of the authority vested in it and decisions of questions only remotely, if at all, related to the administration of the Unemployment Compensation Law."

tablished that the union's offer to stay on the job on a day-to-day basis was unreasonable. In explaining this conclusion, the Supreme Court said:

". . . It must be kept in mind that the Hershey Estates consists mainly of service industries, i.e., a hotel, laundry, department store, community inn, etc. The nature of these industries is such that it would be almost impossible to operate them adequately on a day to day basis. There was, therefore, more than enough justification under these circumstances for the Employer to take the position that it would be impractical to operate such service establishments on a twenty-four hour basis . . ." Surely, the Board's refusal to draw the same conclusion in the present case is not unreasonable, since the union had been working on a day-to-day basis with the company's consent for over two weeks. Nor does the record indicate that the employer would have permitted work to continue after July 18, under the terms of the expired contract, for any stipulated period of time.

Appellant contends that the decision of the Board contains specific findings of fact which are not supported by the evidence. Section 510 of the Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897, art. V, §510, as amended, 43 P.S. §830, provides that: ". . . the findings of the board or the referee, as the case may be, as to the facts, if supported by the evidence and in the absence of fraud, shall be conclusive . . ." We have repeatedly affirmed our statement in *Stillman Unemployment Compensation Case*, 161 Pa. Superior Ct. 569, 575, 56 A. 2d 380, 383 (1948), that: "The credibility of the witnesses, the weight of their testimony and the reasonable inferences to be drawn from it are for the board. Our duty is performed by studying the testimony in the light most favorable to the party in whose favor the board has found, giving that party the benefit of every inference which can be

logically and reasonably drawn from it." See *Ristis Unemployment Compensation Case,* 178 Pa. Superior Ct. 400, 403, 116 A. 2d 271, 272 (1955).

We have carefully reviewed all of the objections which appellant has raised with respect to the Board's findings, and we hold that they are without substance.[7]

Appellant argues that it was denied due process of law by rulings and actions of the referee. In unemployment compensation proceedings the referee has wide latitude in the admission of evidence. The numerous exhibits and extensive testimony demonstrate that each party had sufficient opportunity to present his case. Careful consideration and review of the entire proceedings below reveal no errors which prejudiced appellant's case.

Finally, appellant contends that the Board awarded compensation for periods during which the appellant was not on notice of the existence of any claims. The

---

[7] Finding No. 14 is supported in the record at pp. 417a and 418. Finding No. 19 is supported in the record at p. 444a. In addition, the appellant objects that finding No. 19 erroneously states that the letter of July 16 was *submitted prior* to the negotiation meeting, when it was in fact submitted *during* the meeting. This objection is without significance. Finding No. 17 is supported in the record at pp. 288a, 294a, and 319a. Finding No. 18 is supported in the record at pp. 295a, 296a, and 297a. Finding No. 16 is supported in the record at pp. 288a, 294a, and 319a. Finding No. 12 is supported in the record at pp. 126a, 132a, 244a, 277a, 278a. Finding No. 13 is supported in the record at pp. 184a, 186a, 188a, 233a, 285a, and 286a. Appellant's challenge to finding No. 11 actually misstates that finding. The Board held that the company's negotiating committee did not have *full power* to negotiate, while appellant states that the board held that the committee had *no power* to negotiate. Finding No. 22 is supported by the record at pp. 75a, 330a, 331a, and 444a. Finding No. 23 is supported in the record at pp. 81a, 83a, 319a, and 418a. Findings 27 and 28 are supported in the record at pp. 314a, 315a, and 316a. Finding No. 29 is supported in the record at pp. 236a, 238a, 240a, 241a, and 320a.

record shows, however, that a letter dated July 17, 1963, was sent from the Bureau to appellant, containing work stoppage questionnaires to be completed by appellant so that the unemployment compensation authorities "may make a determination in this work stoppage." Certainly, we cannot believe that appellant was so naive, that it was unaware of the existence of potential claims for unemployment compensation in the present case.

A lock-out may be present in varying factual situations. *McGinnis Unemployment Compensation Case,* 184 Pa. Superior Ct. 95, 100, 132 A. 2d 749, 752 (1957). After examining the record in the present case we must conclude that the Board was warranted in finding that the claimant and his fellow-employees did everything necessary to continue working pending further negotiations; that appellant was ultimately responsible for the work stoppage; and that such stoppage constituted a lockout. It follows that the allowance of benefits was proper.

Decision affirmed.

ERVIN, P. J., and MONTGOMERY, J., concur in the result.