Philco Corporation *v.* Unemployment Compensation Board of Review, Appellant.

Argued November 21, 1967.  Before Bell, C. J., Musmanno, Jones, Cohen, Eagen, O'Brien and Roberts, JJ.

reargument refused February 15, 1968.

*Harry R. Kozart,* with him *Weissman & Kozart,* for appellant.

*Ronald Souser,* with him *Morgan, Lewis & Bockius,* for appellee.

OPINION BY MR. JUSTICE ROBERTS, January 9, 1968:

The narrow question presented by this appeal is whether a work stoppage which began on April 27, 1964 at the Philadelphia plant of appellee (Philco Corporation) was the result of a strike or a "lock-out", as the latter term is used in the Act of December 5, 1936, P. L. (1937) 2897, §402, as amended, 43 P.S. §802(d). Under this statute an employee is not eligible for unemployment compensation pursuant to a work stoppage flowing from a labor dispute, unless that stoppage was caused by a lock-out. Since we hold that the work stoppage here involved was the result of a strike by the employees of Philco, it follows that the Bureau, the referee and the Superior Court correctly denied benefits to the claimant.[1]

This is but another of those troublesome areas where the legal test as distilled from previous cases is easy to verbalize, but most difficult to apply to any given set of facts. Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing. As this Court stated in *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 444-45, 163 A. 2d 91, 93-94 (1960), the question we must answer to decide on whose shoulders lay the responsibility for the work stoppage is the following:

---

[1] Even the Unemployment Compensation Board of Review, the only tribunal to find in favor of the claimant, did not do so unanimously, one member refusing to join the decision.

"Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a 'lockout' . . . ."

Further refinements of this test reveal additional legal principles which are necessary for a proper resolution of the present controversy. As the Superior Court opinion below correctly notes, when, as here, the work stoppage takes the *form* of a strike, the burden is upon the union to show that it made the initial "peace" move by offering to continue the status quo. *Clark Unemployment Compensation Case,* 209 Pa. Superior Ct. 239, 242-43, 223 A. 2d 909, 911 (1966) ; see *Klima Unemployment Compensation Case,* 205 Pa. Superior Ct. 489, 211 A. 2d 23 (1965). However, since it is conceded in the present controversy that no such offer was made, the union must rely on the so-called "futility" doctrine as set out in *Irvin Unemployment Compensation Case,* 198 Pa. Superior Ct. 308, 181 A. 2d 854 (1962), holding that the union need not offer to continue the status quo if it appears that such an offer would definitely not be accepted by management.

Into the legal framework outlined above, we must now attempt to fit the facts of this case. Initially, however, we acknowledge that our scope of review is limited not only by statute, but also by previous decisions of this Court as well as the Superior Court. The Act of December 5, 1936, P. L. (1937) 2897, §510, as amended, 43 P.S. §830 states: "In any appeal to the Superior Court the findings of the board or referee, as the case may be, *as to the facts, if supported by the evidence*

and in the absence of fraud, shall be conclusive . . . ."
(Emphasis supplied.) See also, *Progress Mfg. Co. v. Unemployment Compensation Bd. of Review*, 406 Pa. 163, 167, 176 A. 2d 632, 634 (1962); *Vrotney Unemployment Compensation Case*, 400 Pa. 440, 445-46, 163 A. 2d 91, 94 (1960). Nevertheless, even assuming arguendo that the Board made a finding of fact, rather than law, when it said in its opinion that "the reason for the work stoppage must be assessed against the employer" because it would have been futile for the union to have asked for an extension of the status quo, we hold that this finding is *not* supported by legally sufficient evidence, as required by the statute.[2]

The contract between union and management was scheduled to expire on Saturday, April 25, 1964. As

---

[2] The writer of this opinion believes that the question of whether a work stoppage was caused by the union or by management is not a pure question of fact, but is, at most, a mixed question of fact and law. I reach this conclusion for two reasons. First, although the opinion of the Board in this case lists fourteen "findings of fact", its actual statement that the work stoppage was caused by management does not appear in that list, but is instead contained in the body of the Board's opinion. Second, and much more significant, is the fact that our cases have held a "lock-out" to be synonymous with a work stoppage initially caused by management. Therefore, a finding of work stoppage causation necessarily dictates the finding of lock-out or strike. Since the existence of a lock-out is the ultimate question for decision under the statute, the decision that a lock-out is present is of course more than a simple finding of fact. It therefore follows that any finding which leads inexorably to this ultimate conclusion must also be more than a finding of pure fact. However, since we here affirm the Superior Court and assume arguendo that the Board's conclusion as to the fault for the work stoppage is a factual finding, there is no need at this time to re-examine our statement in *Vrotney Unemploymentment Compensation Case*, 400 Pa. 440, 445-46, 163 A. 2d 91, 94 (1960) that "[o]nce we accept as *fact* that the ultimate responsibility for the work stoppage lay with the employer, it is clear that there has been a 'lockout' thus qualifying the claimants for benefits under the Act." (Emphasis supplied.)

early as November of the preceding year, it became apparent to all concerned that the company was in such serious financial straits that substantial contract revisions would be pressed for by management. These revisions were actually presented to the union on March 23, 1964, the first day of formal negotiations. It is uncontradicted that from this date forward the company insisted at the bargaining table that acceptance of these terms by the union was necessary for company survival. However, the record is unclear as to whether management ever told the union that the company would definitely close down after the existing contract expired if these new terms were not accepted. Mr. Block, the chief union negotiator, testified that Mr. Meredith, "general manufacture manager" of Philco's consumer products division, did state at the March 26, 1964 bargaining meeting that the plant would close unless Philco's demands were met. However, Block admitted on cross-examination that he never once after that date brought up the subject of post-contract work availability. Furthermore, Meredith himself strongly denied having ever made the alleged statement, and introduced documentary evidence (travel vouchers) to show that he was in Iowa on the 26th of March.

In addition to the company's strong bargaining position, and Meredith's alleged statement of March 26th, the union claims that its belief in a no contract-no work position by management was strengthened by a speech, delivered to the workers on March 10, 1964 by Mr. Beck, the company president. However, we have carefully combed every word of this speech and fail to find a single statement, even a hint, that no work would be available on Monday, April 27, 1964 if the union did not acquiesce. The strongest language in the entire speech was that Philco's business would be a "waste of time, money, and effort" without the new contract, and that the plant's "ultimate survival" was at stake.

This language does not approach the threatening tone of the speech delivered by management in *Irvin,* supra, the case upon which the union relies to support its claim of futility. In *Irvin,* the union had suggested a two week extension of the status quo pending further negotiations. At the end of this two week period, the union was again prepared to offer an extension, but before this offer could be made, the company president stated that anyone who reported for work the next day could do so only on his terms. On these facts, it was of course held that the employees were locked out even though the work stoppage took the form of a strike, and even though a second extension of status quo was never actually sought by the union.

The union here next contends that prior to April 27, 1964, the company began making plans for a work stoppage. Specifically, it was testified to below that on Friday, April 24, 1964, workers were told to put preservative grease on certain machines, and that even before that, the company had begun to stock extra food for its supervisory personnel, and had constructed a special gate for these men to use in case the main entrance to the plant was picketed. However, none of these measures are in any way inconsistent with normal management preparations for a *strike.* They do not foreshadow a *company* induced work stoppage, any more than the union's preparation of picket signs would indicate that a subsequent work stoppage must be the fault of labor.

After more than twenty bargaining sessions, continuing from March 23, 1964 to the morning of April 25, it appears that neither side was willing to make any significant concessions. Therefore, the union held a membership meeting on Saturday afternoon, April 25, at which time the men voted not to report for work the following Monday. At no time did the union offer to extend the status quo; nor did the company make a

similar offer, although several company representatives did testify that work *was* available on Monday. They justified management's failure to inform the union of this work on the ground that such information would have weakened Philco's position at the bargaining table. On the basis of this evidence the Board concluded that it would have been futile for the union to have requested an extension of the status quo, or to have reported to the plant on Monday, ready to work. With this conclusion, be it one of fact, law, or both, we cannot agree.

Even to laymen, and certainly to experienced labor representatives, the realities of the bargaining process are far from unknown. Both labor and management usually approach the bargaining table fully conscious that the bridge between the old and new contracts will not be crossed before both sides have aired ideas ranging from constructive suggestions to threats of the most dire consequences. As the Superior Court said in *Hogan Unemployment Compensation Case,* 169 Pa. Superior Ct. 554, 561, 83 A. 2d 386, 390 (1951) : "the incidents common to all types of bargaining must be expected and indulged; e.g., wordy chaffering, haggling over details, maneuvering for position, feigned ultimatums, offers of compromise settlements, and the like." Thus we do not feel that a hard bargaining line, even so hard as to insist that plant survival depends on union submission to management demands, can by itself support an invocation of the futility doctrine. Of course, we realize that the union claims there *is* more here. There is the president's speech as well as Meredith's statement.[3] It appears that the union advocates

---

[3] For purposes of this appeal, we shall assume that Meredith actually made the statements attributed to him, in spite of his "alibi" and his flat denial. We do so, mindful of the fact that in reviewing the Board, we give every reasonable inference to the party in whose favor the Board found, here the claimant. *Bokoski Unemployment Compensation Case,* 206 Pa. Superior Ct. 96, 106,

the following syllogism: On March 26, Meredith stated that without the new contract the plant would close on April 27th. Thereafter, although nothing about plant closing was mentioned, management insisted that the new contract be signed, and this insistence continued until the morning of Saturday, April 25th. Therefore, Saturday's bargaining position by management was equivalent to a statement that the plant would close on Monday.

Even giving every possible inference favorable to the claimant, we could say only that on *Saturday,* April 25th, the union may have been justified in its belief that the company would not open on Monday without the new contract. But what about the next 36 hours, the period between the union's strike vote and the actual work stoppage on Monday morning? If there was any possibility that management would make a last minute concession, if there was any possibility that something further would happen to make the union believe that an offer to continue the status quo would be accepted, these possibilities were absolutely *foreclosed* by the union's Saturday strike vote. The union, 36 hours *before* the company would have been forced to open or close its doors, decided that no one would report for work on Monday. This is a far cry from the *Irvin* case where management, on the very eve of the stoppage, declared that there would be no work except on company terms. In the present case, if there ever *was* such a statement, *it came over a month before* the work stoppage, and even then, was made only by a minor company officer, not even an official bargaining representative, let alone the president.

---

211 A. 2d 124, 129 (1965) ; *Stillman Unemployment Compensation Case,* 161 Pa. Superior Ct. 569, 575, 56 A. 2d 380, 383 (1948). As for the president's speech, however, we are unable, even by the most careful inference gleaning, to conclude that the union could have assumed from Mr. Beck's remarks that the plant would close on April 27th.

In the area of labor relations, it is well known that many major and frequently unexpected concessions, by both labor and management, often occur only hours before the work stoppage is scheduled. In fact, there is uncontradicted testimony by one of Philco's attorneys that its contracts, over the past several years, have purposely been drafted to expire on Saturday, in order that the following Sunday could be used for last minute bargaining. Where, as here, the union has unilaterally prevented any such last minute session, it cannot be heard to say that a proposal to continue the status quo would have been futile as a matter of fact or law.

Our unemployment compensation benefits are paid out of a public fund created to aid those men who have lost their jobs through no fault of their own. As we said in *Lybarger Unemployment Compensation Case,* 418 Pa. 471, 478, 211 A. 2d 463, 467 (1965) : "The purpose of the Act is to prevent the worker from becoming the innocent pawn of forces and movements beyond his control." It is certainly not intended to provide additional strike benefits for union members. When it is considered that this entire controversy could have been avoided had the union merely asked one simple question, or sent some of its members to work on Monday in a bona fide effort to continue the status quo, this Court will not allow such a question to go unasked, or such action to go untaken, without a clear showing that a request for status quo would actually have been futile. Such a showing has simply not been made.

The order of the Superior Court is affirmed.

Mr. Justice MUSMANNO dissents.

———

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I join in the Opinion of the Court, but desire to emphasize as the majority Opinion writer does, that the question of whether a work stoppage is a strike or a

lock-out is almost always a mixed question of fact and law.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

Both the Referee and the Board found as facts that spokesmen for Philco Corporation on many occasions insisted that its proposals had to be adopted on the new collective bargaining agreement or the plant would be required to close. They also found that no statement was made by any spokesman for Philco at any time that continued work was available under the same terms and conditions which existed under the expiring collective bargaining agreement. Thus, we have a situation that from November, 1963 up until March 23, 1964, the Union and Philco were negotiating to replace the expiring collective bargaining agreement. Then on March 23, 1964, Philco submitted to the Union a demand for changes to be made part of the new agreement. These changes would have substantially reduced the benefits received by the employees in prior contract agreements. Philco at that time indicated that these proposals must be accepted or the plant would be closed.

Such a technique, namely, "the take it or leave it" approach is held to be bad faith collective bargaining. Philco did not retreat from its bad faith technique from March 23, 1964 until April 26, 1964, and at no time did Philco indicate to the Union that work was available under the same terms and conditions as contained in the expiring agreement. I cannot see how, under those circumstances, it then becomes necessary for the claimants to perform a futile act in view of the adamant bad faith position assumed by Philco in order to make what was an apparent lock-out even more apparent.

This case is succinctly summarized in the decision of the Board as follows: "The record reveals that the collective bargaining agreement entered into by the

Union and Philco corporation on April 30, 1962 was due to expire on April 26, 1964. That from November, 1963, until the contract expired, at 12:01 a.m., April 26, 1964 fifteen to twenty meetings were held in attempts to reach satisfactory terms for a new agreement. The record further reveals that the Union prior to March 23, 1964 submitted its proposal for a new agreement to the Corporation and on March 23, 1964, the Corporation submitted to the Union its proposals which it demanded had to be made a part of the new agreement. The proposals by the Corporation would have substantially changed and done away with terms and conditions won by the employees in prior contract agreements. The Corporation, from March 23, 1964 up to April 26, 1964, refused to change its position that the Union must accept its proposals or else the plant would be closed. The Law contemplates that collective bargaining must be conducted in good faith using sincere purpose to find a basis for agreement. The Corporation's adamant attitude and its ultimatum that its proposals must be accepted or the plant would be closed gave the Union no choice but to remain away and not to report for work. It is not necessary for claimants here to perform a futile act and report to work when they knew that work would not be available to them under the same terms and conditions that existed prior thereto. The Board, therefore, concludes that the reason for the work stoppage must be assessed against the employer and that it was due to a lockout and, accordingly claimant cannot be disqualified from receiving benefits under the provision of Section 402(d) of the Law."

All the findings of fact and conclusions of the Board are amply supported by evidence and the decision of the Board under applicable law should not be disturbed.

I dissent.

Mr. Justice EAGEN joins in this dissenting opinion.