Harold P. Watkins, Individually and as Representative Claimant in Mass Appeal, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Harold P. Watkins, Individually and as Representative Claimant in Mass Appeal, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued November 17, 1980, before Judges WILKINSON, JR., CRAIG, and PALLADINO, sitting as a panel of three. Reargued May 5, 1981, before President Judge CRUMLISH, and Judges MENCER, BLATT, WILLIAMS, JR., CRAIG, MACPHAIL and PALLADINO, Judge ROGERS did not participate.

*Ernest B. Orsatti, Jubelirer, Pass & Intrieri, P.C.,* for petitioner.

*C. Grainger Bowman,* with him, *Norman I. White, McNees, Wallace & Nurick,* for respondent employers.

OPINION BY JUDGE MACPHAIL, August 13, 1981:

This is an action to determine the eligibility of Harold P. Watkins (Claimant) individually and as the representative claimant in this mass appeal. Specifically, Claimant has petitioned for review of two orders[1] of the Unemployment Compensation Board of Review (Board), both of which affirmed the referee's denial of unemployment compensation benefits to Claimant based on the disqualifying provisions of Section 402(d) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d).[2]

The essential facts are not in dispute. Lincoln Coach Lines (Coach) provides intercity passenger bus service between Butler and Pittsburgh and Cumberland, Maryland and Pittsburgh. In addition, it has

---

[1] Decision No. B-173519 covered the compensable period for weeks ending June 17, 1978 through July 15, 1978 and Decision No. B-173518 covered the period for weeks ending July 22, 1978 through August 19, 1978.

[2] The relevant portion of Section 402(d) of the Law provides as follows:

An employe shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lock-out) at the factory. . . .

many charter bus operations outside of Pennsylvania. Until 1964, it also provided bus service between Greensburg and Pittsburgh.

In 1964, the management of Coach formed a separate corporation, Lincoln Lines, Inc. (Lines), to operate the bus service between Greensburg and Pittsburgh because it was thought that at some point in time the Pittsburgh Port Authority might be interested in acquiring the Allegheny County portion of that service. In fact, such did occur on March 6, 1978.

Although there were two separate corporations, the buses of both companies operated from a single premises and under common management. Employees were used interchangeably by the two corporations. Until 1976, there was a single bargaining agreement for the employees of both companies. In 1976, separate, but identical, contracts were negotiated for the two companies, again to facilitate the transfer of operating rights to the Pittsburgh Port Authority with respect to a portion of Lines' operations. Nevertheless, a common seniority list existed for both companies (hereinafter collectively Employer) and the interchange of employees continued.

On June 5, 1978, the bargaining agreements expired. Bargaining sessions continued through June 9, 1978. On that date, Employer sent a memorandum to Division 1357 of the Amalgamated Transit Union (Union), the bargaining agent for the employees, setting forth conditions under which Employer thought it could continue to operate the bus lines. Most pertinent to the appeal now before us were the conditions that the Union would state in writing that they would not institute a work stoppage without 48 hours advance notice to Employer and that any trip commenced by Union employees would be completed notwithstanding any work stoppage. The memorandum

specified that unless the Union agreed to those terms before noon on June 11 (a Sunday), Employer would discontinue operations.

At about 10:30 a.m. on June 11, a letter from Union's counsel was hand-delivered to the home of Employer's president. Pertinent excerpts from that letter, which did not refer directly to the memorandum from Employer, are:

> We are further advising that the employees are willing to continue to work for a reasonable period of time with assurances that each day they commence work they would complete that assigned work or charter. You apparently do not wish to continue that type of relationship and consequently are deciding to lock the employees out. . . .

> As we have previously stated, we are willing to continue to work under the terms and conditions of the expired collective bargaining agreement for a reasonable period of time with assurance that each piece of work that is taken out will be completed as scheduled. If future events require us to alter this position, you will be given reasonable advance notice thereof. Apparently, the employer is not interested in this type of arrangement and consequently the members, their families and the public must suffer. . . .

In view of the fact that the Union letter was delivered prior to the 12 o'clock deadline fixed by Employer and that it addressed both of the conditions set forth in Employer's memorandum of June 9, Employer assumed that Union had agreed to continue operations under the conditions specified by the Employer and made a public announcement to that effect. Shortly before midnight on the same day, however, Employer was informed that Union had struck Coach.

The following day there were picket lines at the premises but some employees reported for work at the usual time. At noon on that day, management made the decision that it could not operate Lines without Coach. On the 13th day of June, Employer and Union met to see if both companies could not resume operations. At that time Union offered to furnish sufficient employees to operate Lines even though some of those employees were technically employed by Coach. Employer took the position that such an arrangement was unworkable from a practical standpoint and also stated that in view of what happened on June 11, it could not lend credence to Union's offer to keep Lines operating.

About the middle of September, 1978, the Employer liquidated Lines for reasons unrelated to the strike and on September 19 notified Union that this had happened. In that same notice Employer notified Union that employment was still available for twenty-two drivers, six mechanics, and one cleaner with Coach.

After making detailed findings of fact, the referee concluded that Claimant was unemployed as the result of a strike and that since work was available to all employees prior to September 19, 1978 and to most employees after the formal dissolution of Lines, Claimant was disqualified for benefits under both claim petitions. As we have noted, the Board without taking further evidence affirmed both decisions in toto.

Essentially, Claimant argues that his unemployment was due to a lockout and not a strike. Although our Supreme Court has set forth on several occasions the criteria to be applied in distinguishing a strike from a lockout, the application of those criteria to a given factual situation is not always easy. In *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968), our Supreme

Court said that the test is which side first refused to continue operations under the status quo after the contract expired but while negotiations were continuing. In *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 444-45, 163 A.2d 91, 93 (1960), the court said the responsibility for a work stoppage depended upon the answer to a two-pronged question:

> Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations?

Finally, the court in *Philco Corp.* said that where the work stoppage takes the form of a strike, the burden is upon the union to show that it made the initial peace move by offering to continue the status quo and that if it made no such move then the union must resort to the so-called futility doctrine, *i.e.*, the union need not offer to continue the status quo if it appears that such an offer would definitely not be accepted by management.

There is substantial evidence to support the referee's findings that both the Union and Employer agreed to continue operation of the bus lines on the same terms and conditions that existed in the expired bargaining agreement while negotiations continued. However, when some newspaper articles appeared which quoted Union officials as saying they would strike at the "most opportune time," Employer, because it was engaged in a public service the disruption of which without adequate prior notice would cause considerable inconvenience to its customers, requested written assurances from Union regarding notice of

stoppage and completion of trips in progress when and if a stoppage occurred.

Where public services are involved, our Supreme Court has held that the Union is under a duty to make a proposal not only to continue working under pre-existing terms and conditions but to represent that it will do so for a *reasonable* time. *Lerch Unemployment Compensation Case,* 400 Pa. 446, 163 A.2d 535 (1960). Therefore, Employer's memorandum of June 9 cannot be treated as a refusal by Employer to continue operations under the expired contract, but rather was a reasonable request the Union should have anticipated.

The referee found as a fact that Union's letter of June 9 was an agreement to the assurances Employer had requested. Admittedly, Union's letter addresses both of Employer's requests affirmatively but it also has language in it which would indicate that the Employer had already rejected the Union's offers in those respects. Indeed, the letter closes with language indicating that the Union was ready to meet with the Employer for further discussions. While the letter is somewhat ambiguous, it is our opinion that a reasonable person receiving such a letter one and one-half hours before a deadline fixed in a previous communication could come to the conclusion that the Employer's request had been accepted by the Union. We find this to be a reasonable inference permitted the referee and the Board. Since Union's letter addresses both companies in its caption, Employer had the right to assume that its terms applied to both companies. Accordingly, as of June 11 at about noon time, there was an agreement by Employer and Union to continue operations under the terms of the expired contract with the caveat that there would be no work stoppage by the Union without reasonable notice and that trips begun by Union employees would be completed in the

event of a work stoppage. To repeat, as of noon on June 11, that was the status quo.

Accordingly, when Union struck Coach on the night of June 11, it was the Union that assumed responsibility for changing the status quo as to that company.

Our final inquiry, then, is who bears the responsibility for the work stoppage at Lines. Employer's position is that Union's decision to strike Coach was effectively a strike against Lines because one could not operate without the other. There can be no doubt that Union was well aware of the integrated employment program. As we have noted, there was a common seniority list. Moreover, Union offered to take employees off the picket line to make it possible for Lines to operate. When Claimant was asked by whom he was employed, his answer was "Lincoln Coach Lines *and* Lincoln Lines, Inc." (Emphasis added.) He went on to say, "We had one common roster where everyone worked for either employer." Therefore, Employer's decision to close Lines was the result of Union's decision to strike against Coach. From a practical standpoint, Employer could make no other decision.

Accordingly, we agree with the referee's conclusion affirmed by the Board that Claimant was unemployed as the result of a strike and not as the result of a lockout.

We also agree with the referee's conclusion that Employer had work available for all employees prior to September 19, 1978, the date on which Lines was formally dissolved. Claimant apparently argues that by virtue of the publication on July 12, 1978 of a notice of dissolution of Lines that work was not available to employees of Lines subsequent to July 12. There is substantial evidence in the record, however, to support the referee's finding that work was indeed available to all of Lines' employees until September

19, 1978. Since work was available, benefits were properly denied for the weeks ending July 23, 1978 through August 19, 1978 due to the continuing strike against Coach.

Having found that the essential findings of fact are supported by substantial evidence and that no error of law was made, *Yasgur v. Unemployment Compensation Board of Review,* 16 Pa. Commonwealth Ct. 33, 328 A.2d 908 (1974), we will affirm.

ORDER

AND Now, this 13th day of August, 1981, the orders of the Unemployment Compensation Board of Review at Decision Nos. B-173518 and B-173519 are hereby affirmed.

---

DISSENTING OPINION BY JUDGE CRAIG:

I must respectfully dissent because the employees were locked out of Lincolin Lines, Inc., the employer corporation as to which unemployment compensation is sought. The facts, as found by the compensation authorities, are undisputed. We cannot overlook the point that there are two distinct corporate employers here: (1) Lincoln Lines, Inc., which shut down when the union would not agree to its demand that the strike be abandoned with respect to its sister corporation, and (2) the Coach Lines corporation, the struck corporation as to which no unemployment compensation is sought. Despite the extent to which there are common principals and employees here, the record contains no basis for piercing the corporate veils so as to merge the corporate identities as one employer. With Lincoln Lines, Inc. conducting distinctly different operations from the Coach Lines corporation, the alter ego theory for ignoring corporate identity does not apply. *Botwinick v. Credit Exchange, Inc.,*

419 Pa. 65, 213 A.2d 349 (1965); *Cf. McCarthy v. Ference,* 358 Pa. 485, 58 A.2d 49 (1948) (second corporation a mere shell). Those who have elected a separate corporate existence are not allowed to deny it merely when their economic interests prompt them to do so. *Sams v. Redevelopment Authority of City of New Kensington,* 431 Pa. 240, 244 A.2d 779 (1968); *Shelburne Sportswear, Inc. v. City of Philadelphia,* 422 Pa. 199, 220 A.2d 798 (1966).

After the union had initially agreed to continue the status quo as to both corporations (as the majority opinion very correctly points out), the union, although striking as to Coach Lines, then agreed to continue participating in the operation of Lincoln Lines, Inc. under the terms and conditions of the expired contract. Each corporation had its separate collective bargaining contract.

With respect to the alleged interdependence of the two corporations, I respectfully point out that the findings of the Unemployment Compensation Review Board and the referee, at least ambiguous on the point, tend to indicate that such was merely the view of the employer. The findings read:

24. The employer could not accept this arrangement, since the two Lines could not operate independently of each other at this point since they had common drivers and other support personnel.

25. As a result of the Union's decision, *the employer decided that it would not be feasible* for them to continue to operate the Lincoln Lines, Inc. without operating the Lincoln Coach Lines, and decided to suspend operation of the Lincoln Lines, Inc. (Emphasis added)

The findings thus appear to reflect that the matter of interdependence was essentially the unilateral opinion of the employer.

We have been given no explanation as to why having employees in common prevented the companies from operating independently of each other.

With respect to the question of the alleged continuing availability of work to the employees during both of the claim periods after June 12 and before September 19, we have the finding that work was available "had the Union agreed to continue working . . . for *both* Lines." (Finding 27, emphasis added) But that simply means that work was *not* available with the unstruck corporation without dropping the strike against the other.

Following *Philco Corp. v. Unemployment Compensation Board of Review*, 430 Pa. 101, 103-04, 242 A.2d 454, 455 (1968), it is clear that the Lincoln Coach Lines, Inc. is the one "on whose shoulders lay the responsibility for the work stoppage" at Lincoln Coach Lines, Inc. That employer was the one who "first refused to continue operations under the status quo."

President Judge CRUMLISH and Judge PALLADINO join this dissent