558 A.2d 571

Effort Foundry, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued April 6, 1989, before Judges COLINS and SMITH, and Senior Judge BARBIERI, sitting as a panel of three.

*Bruce J. Kaston,* with him, *Edward H. Feege* and *Carl H. Shuman, Duane, Morris & Heckscher,* for petitioner.

*John E. Herzog,* Assistant Counsel, with him, *Clifford F. Blaze,* Deputy Chief Counsel, for respondent.

OPINION BY SENIOR JUDGE BARBIERI, May 1, 1989:

Effort Foundry, Inc. (Petitioner) petitions for review of the order of the Unemployment Compensation Board of Review (Board) which affirmed a referee's decision awarding benefits to Jerome E. Lynn (Claimant) and 23 other employees because they had been constructively "locked out" of their place of employment during a labor dispute pursuant to Section 402(d) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d). We affirm the Board.

Claimant was a member of Local 14797 of the United Steel Workers of America (Union) which represented employees at Petitioner's plant. The labor management agreement between the Union and Petitioner was set to expire by its own terms on December 14, 1987. Prior to this date, the parties held a series of negotiating sessions during which Petitioner represented it was seeking economic concessions from the Union in order to remain competitive. The Union rejected Petitioner's position and asked for and received financial information about the company to verify Petitioner's claim of economic distress.

On December 14, 1987, Petitioner presented the Union its final offer which demanded wage and benefit cuts. The Union's representative stated this proposal was unacceptable but offered to take back to its membership a proposal to extend the present contract for a three month, six month or one year period. Petitioner replied that it could not hang on that long and that work would only be available on December 15, 1986, under the terms of its final wage offer. The Union then held a membership meeting and unanimously rejected Petitioner's final offer.

The Union struck Petitioner's plant at midnight on December 14, 1987.

On January 12, 1988, while the strike was continuing, the parties held another negotiating session before a federal mediator. Petitioner offered to allow the employees to return to work at substantially the same wage rate as before, but with a different recall and employee discipline policy. The Union rejected this proposal and the strike continued.

The referee awarded benefits to Claimant, who is the test employee in this case, because he found that the Union attempted to maintain the *status quo* between the parties by offering to extend the existing contract, which offer Petitioner rejected, thereby converting this labor dispute into a constructive lockout under the holding of *Vrotney Unemployment Compensation Case,* 400 Pa. 440, 163 A.2d 91 (1960). The Board made its own findings of fact and affirmed.

Petitioner presents several related arguments. First, Petitioner notes the Union did not formally offer to extend the contract, it merely offered to take a proposal for an extension back to its membership. Second, Petitioner argues that the Union's offer to extend the contract did not contemplate that negotiations would continue, but was instead a proposal for a contract of limited duration and therefore not an attempt to maintain the *status quo* between the parties. *See Jehn v. Unemployment Compensation Board of Review,* 110 Pa. Commonwealth Ct. 209, 532 A.2d 57 (1987). Third, Petitioner asserts that if a lockout did occur on December 14, 1987, its offer to take the employees back at the previous wage rate on January 12, 1988 converted any lockout back into a strike. We review Petitioner's contentions *seriatim,* mindful that the Board is the final arbiter of credibility and its decision must be affirmed if supported by substantial evidence.

*Peak v. Unemployment Compensation Board of Review,* 509 Pa. 267, 501 A.2d 1383 (1985).

Initially, we must determine if the Union's offer to take a proposal for contract extension back to its membership is sufficient to satisfy its burden under *Vrotney* of offering to continue working under the terms and conditions of the existing contract. The union need not offer to continue the *status quo* if it definitely appears the gesture would be "futile" and not accepted by management. *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968). The response of Petitioner's representative, William Corry, to the Union's offer is illustrative of the futility doctrine:

Q: The only offer was for the three-month, six-month or one year?

A: Right.

Q: And take it back to the membership?

A: Yeah. And that's a long time. Three months.

. . .

Q: What was your response to that?

A: My response was, is that we just can't hang that long . . . we need immediate help, immediate relief . . . .

(N.T. 64, R.R. 78a). The Union representative testified that Mr. Corry stated that Petitioner's final offer would be unilaterally implemented at midnight that day. Under the circumstances, the Union had no duty to have its membership vote on a contract extension and then present a formal offer to management. Petitioner had already rejected even the suggestion of an extension.

Petitioner next asserts that what the Union attempted to do was not to offer to continue working under the existing terms of the contract pending negotiations, but to offer a new contract of limited duration under the same terms, at the end of which the Union would take another look at the situation depending on the financial strength

of the company. This is legally insufficient to convert the strike into a lockout. *Jehn; Hoffman v. Unemployment Compensation Board of Review,* 100 Pa. Commonwealth Ct. 264, 514 A.2d 668 (1986). This argument turns on the question of whether continuing negotiations were contemplated during the proposed contract extension.

Whether negotiations were contemplated is a question of the intent of the parties. Petitioner's counsel attempted to ascertain this intent through cross-examination of the Union's shop steward, Michael Nothstein:

Q: . . . You were not offering just to extend to allow the parties to continue to negotiate. You were offering that extension so that you felt that within that period of time, whatever it was, the Company's financial condition would improve. Is that a fair statement?

A: No. Not necessarily . . . .

(N.T. 33, R.R. 47a). Petitioner's counsel then asked Nothstein if another Union representative had told Petitioner in Nothstein's presence that after the period of extension the Union would take a look at the financial condition of the company which would have improved by that time. Nothstein's answer was:

A: I don't recall him saying, you know, saying anything like that.

(N.T. 46, R.R. 60a).

This testimony established that the Union was open to the possibility of continuing negotiations during the proposed contract extension. More to the point, a negotiating session did occur on January 12, 1988, less than one month after the Union offered to extend the contract. Petitioner initially argues that no continuing negotiations were contemplated by the Union at the time of the strike. In the next breath, Petitioner reveals that a negotiating session did in fact take place four weeks later. The Board's finding that the Union was open to continuing negotia-

tions is supported by substantial evidence. Continuing negotiations did in fact take place.

Finally, Petitioner asserts that its offer made at the January 12, 1988 negotiating session converted the lockout back into a strike. Petitioner's offer, which is found as Exhibit C-4 at R.R. 117-118a, did make work available at the same wage rate as the expired contract. However, this offer contained the following terms:

> You will notice that I am now offering 6 cents per hour average less than the offer made on December 14, 1987. The 6 cents represents the cost to Effort Foundry because of the damage to equipment and property since the labor dispute began. The more damage received in the future, the less any future offer will be.
>
> During the strike we have discovered we can operate the facility with less employees when we use the right people in the right jobs.
>
> The company proposes that after the strike is over, it will have the right to recall employees based solely on its needs and the abilities and qualifications of the employee in question. Also, the determination of who to recall and when the recall will occur will be made by the company and not be subject to the grievance procedure.
>
> Finally, after the strike is over, Mike Nothstein will be investigated for various acts of picket line misconduct. Jerry Nothstein, James R. Sherer, Donald Saylor, Kevin Schratt, and David Warner will be investigated for sabotage which occurred the night before the strike began. The company reserves the right to impose any discipline up to, and including discharge based upon the results of the investigation.

(R.R. 118a). The Union understood Petitioner's offer to include these terms. It is obvious this offer is an attempt

to break the Union, not preserve the *status quo*. Consequently, the offer did not convert the lockout back into a strike. The order of the Board is affirmed.

ORDER

NOW, May 1, 1989, the order of the Unemployment Compensation Board of Review at Nos. B-266212—B-266235, dated June 6, 1988, is hereby affirmed.