JOHNSON et al., Appellees,

v.

ADMINISTRATOR, OHIO BUREAU OF EMPLOYMENT
SERVICES, et al., Appellants.

[Cite as *Johnson v. Ohio Bur. of Emp. Serv.* (1993), 82 Ohio App.3d 293.]

Court of Appeals of Ohio,
Montgomery County.

Nos. 13491, 13500.

Decided Jan. 21, 1993.

*Peter M. Fox,* for appellees.

*Lee I. Fisher,* Attorney General, and *David E. Lefton,* Assistant Attorney General, for appellant Administrator, Ohio Bureau of Employment Services.

*Kirkland & Ellis* and *Elizabeth Miller Roesel,* for appellant Miami Paper Corporation.

BROGAN, Judge.

Appellants, Administrator, Ohio Bureau of Employment Services ("OBES") and Miami Paper Corporation ("the company"), appeal from the judgment of the Montgomery County Court of Common Pleas in favor of appellees, Hugh E. Johnson et al. ("the employees").

The underlying facts and procedural history of the case are as follows. Appellees are employees represented by the United Paperworkers International Union ("the union") in collective bargaining negotiations with the company. In the fall of 1984, the company and the union entered into negotiations for a new contract to replace the contract set to expire on April 5, 1985. Wages under the old contract were in excess of both local and national averages. Moreover, in the first five months of 1985, the employer had generated losses of $882,000. During December 1984, the union rejected an offer from the company which contained decreases in wages.

When negotiations resumed on February 8, 1985, the company claimed that its competitive situation in the market had further deteriorated due to an oversupply of paper and lower prices from foreign producers. The company sought concessions in its negotiations with the union. In early April 1985, the company, at the union's request, agreed to extend the terms of the expiring collective bargaining agreement on a day-to-day basis while the parties continued to negotiate a new agreement. Between February 8, 1985 and June 19, 1985, twenty-one negotiation sessions were held.

In late May 1985, the company proposed a contract that was represented as a "final offer." That offer called for mandatory overtime and wage reductions of approximately seven percent. However, the proposal included a $1,000,000 concession from the employer's previous position. The union unanimously rejected this final offer. The company interpreted the union's position as an impasse in negotiations. At the time the parties' positions over the three-year contract period remained approximately $8,100,000 apart.

On July 8, 1985, believing that impasse had been reached and that any further compromise would jeopardize its business position, the company unilaterally implemented the terms of its final offer. In response, the union filed a complaint with the Regional Director of the National Labor Relations Board ("NLRB"), alleging that the company was bargaining in bad faith and that negotiations had not reached an impasse. The regional director, however, rejected the union's arguments.

On August 28, approximately seven weeks after the terms of the final offer went into effect, the employees went on strike while the company was in the midst of overhauling its machinery. The employees then filed for, and were

initially granted, unemployment compensation on the basis that they had been "locked out" by the company. However, a subsequent request for reconsideration made by the company led to a redetermination of the matter. The Unemployment Compensation Board of Review ("board of review") found that the employees had become unemployed due to a labor dispute other than a lockout, and reversed the decision to grant unemployment benefits.

The employees appealed to the Montgomery County Court of Common Pleas, which reversed the board of review's determination and reinstated the unemployment benefits.

The company and OBES timely filed a notice of appeal from the decision of the trial court. Both the company and OBES assert the following assignment of error: The trial court abused its discretion in failing to defer to the determination of the board of review that the employees were not entitled to unemployment compensation pursuant to R.C. 4141.29(D)(1)(a). The company further asserts that the trial court erred in holding that Ohio's "status quo" test for unemployment benefits, as applied to this case, is not preempted by the National Labor Relations Act. The employees argue that the trial court was correct in concluding that the company's unilateral implementation of its final offer constituted a constructive lockout, thereby qualifying them for unemployment compensation.

The law controlling the outcome of this case is found at R.C. 4141.29(D)(1)(a) and in *Bays v. Shenango Co.* (1990), 53 Ohio St.3d 132, 559 N.E.2d 740.

R.C. 4141.29(D)(1)(a) states:

"(D) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:

"(1) For any week with respect to which the administrator finds that:

"(a) His unemployment was due to a labor dispute other than a lockout at any factory, establishment, or other premises located in this or any other state and owned or operated by the employer by which he is or was last employed; and for so long as his unemployment is due to such labor dispute."

In *Bays,* the Supreme Court of Ohio stated, *id.* at 134–135, 559 N.E.2d at 742–743:

" ' * * * the sole test under * * * the Unemployment Compensation Law, * * * of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the preexisting terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms

and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout" and the disqualification of unemployment compensation benefits in the case of a "stoppage of work because of a labor dispute" does not apply.' "

The employer may refuse to accept the employees' offer to extend the terms of the preexisting collective bargaining agreement if it has a " 'compelling reason for failing to so agree such that the extension of the contract would be unreasonable under the circumstances.' " *Id.* at 135, 559 N.E.2d at 743, quoting *Oriti v. Bd. of Review* (1983), 7 Ohio App.3d 311, 314, 7 OBR 394, 398, 455 N.E.2d 720, 724. The test of whether a work stoppage is the result of a strike or a lockout requires the court to determine " 'which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.' " *Id.*, 53 Ohio St.3d at 135, 559 N.E.2d at 743, quoting *Philco Corp. v. Unemp. Comp. Bd. of Review* (1968), 430 Pa. 101, 103, 242 A.2d 454, 455.

Thus, the *Bays/Oriti/Philco* status quo analysis requires the factfinder to answer several questions when determining whether a work stoppage is the result of a strike or a lockout: (1) Did the employees manifest an intention to maintain the status quo by offering to continue working for a reasonable time under the terms of the existing agreement; (2) did the employer agree to maintain the status quo by allowing the employees to continue working for a reasonable time under the existing agreement; (3) if the employer fails to agree to accept the employees' offer to extend the existing agreement, did the employer have a compelling reason for failing to agree such that an extension would be unreasonable under the circumstances; (4) when either party first refused to continue under the status quo, had a "reasonable" period of time elapsed between the agreement to maintain the status quo and the subsequent refusal to continue thereunder; and (5) when either party first refused to continue under the status quo, were negotiations "continuing" or had the relationship of the parties broken down to the point where meaningful negotiations had ceased, *e.g.*, such as where a lawful impasse had been reached.

We conclude that the trial court erred in reversing the decision of the board of review. "Upon appeal, a court of law may reverse such decisions only if they are unlawful, unreasonable, or against the manifest weight of the evidence." *Irvine v. Unemp. Comp. Bd. of Review* (1985), 19 Ohio St.3d 15, 17–18, 19 OBR 12, 15, 482 N.E.2d 587, 590, citing *Brown–Brockmeyer Co. v. Roach* (1947), 148 Ohio St. 511, 518, 36 O.O. 167, 170, 76 N.E.2d 79, 83–85. In making such a determination, the trial court is not permitted to make factual

findings or to determine the credibility of witnesses. *Hall v. Am. Brake Shoe Co.* (1968), 13 Ohio St.2d 11, 13, 42 O.O.2d 6, 7–8, 233 N.E.2d 582, 590. "The resolution of purely factual questions is for the board of review and its referees as triers of facts." *Angelkovski v. Buckeye Potato Chips Co., Inc.* (1983), 11 Ohio App.3d 159, 161, 11 OBR 242, 244, 463 N.E.2d 1280, 1282, citing *Brown–Brockmeyer Co. v. Roach, supra.*

"The duty or authority of the courts is to determine whether the decision of the board is supported by the evidence in the record." *Irvine, supra,* citing *Kilgore v. Bd. of Review* (1965), 2 Ohio App.2d 69, 71, 31 O.O.2d 108, 109, 206 N.E.2d 423, 424. "[A] reviewing court will not reverse on the manifest weight of the evidence where reasonable minds could weigh the evidence and arrive at contrary conclusions." *Angelkovski, supra,* 11 Ohio App.3d at 161, 11 OBR at 244, 463 N.E.2d at 1283, citing *Parker v. Anheuser–Busch* (Jan. 28, 1982), Franklin App. No. 81AP–718, unreported, 1982 WL 3957. " 'Our statutes on appeals from such decisions [of the board] are so designed and worded as to leave undisturbed the board's decisions on close questions. Where the board might reasonably decide either way, the courts have no authority to upset the board's decision.' " *Irvine, supra,* 19 Ohio St.3d at 18, 19 OBR at 15, 482 N.E.2d at 590, quoting *Charles Livingston & Sons, Inc. v. Constance* (1961), 115 Ohio App. 437, 438, 21 O.O.2d 65, 65–66, 185 N.E.2d 655, 656.

■ Our review of the record supports the decision of the board of review. The *Bays/Oriti* "status quo" test contains a distinct definition of a "lockout," which requires the factfinder to determine " 'which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.' " *Bays, supra.* If management is the first to disturb the status quo, then such action constitutes a lockout and the employees are entitled to unemployment compensation. On the other hand, if the union is the first to disturb the status quo, then such action constitutes a strike and the employees are not entitled to unemployment compensation. However, the *Bays/Oriti* definition of a lockout applies only while negotiations are "continuing."

■ In this case, the record clearly indicates that the company reasonably believed that impasse had been reached when it unilaterally implemented its final offer on July 8, 1985. While the company was clearly the first party to "blink" in this labor dispute, the record supports the conclusion that meaningful negotiations were no longer "continuing" at the time the company implemented the terms of its final offer. Therefore, according to the dictates of the *Bays/Oriti* analysis, the company did not deviate from the status quo because negotiations were no longer "continuing" when it implemented its

final offer. Thus, the referee's determination of whether the work stoppage was a strike or a lockout properly could be made with reference to the definition of a "lockout" contained in *Zanesville Rapid Transit, Inc. v. Bailey* (1958), 168 Ohio St. 351, 7 O.O.2d 119, 155 N.E.2d 202.

While it is clear that management may lawfully implement the terms of its final offer after impasse has been reached, the terms of such an offer may nonetheless constitute a lockout for the purposes of unemployment compensation. Cf. *id. Zanesville* states the following definition of a "lockout" as it relates to R.C. 4141.29(D)(1)(a), *id.* at 354–355, 7 O.O.2d at 122, 155 N.E.2d at 205–206, quoting *Almada v. Admr., Unemp. Comp. Act* (1951), 137 Conn. 380, 389–391, 77 A.2d 765, 771:

" 'The imposition by the employer of changes in working conditions or wages, even though they deprive the employees of some advantage they already possess, does not necessarily constitute a lockout. Changes in the terms of employment might still be such that under all the circumstances the employees would still be expected in reason to accept them rather than quit work. To constitute a lockout * * * the conditions of further employment announced by the employer must be such that the employees could not reasonably be expected to accept them and they must manifest a purpose on the part of the employer to coerce his employees into accepting them or some other terms. * * *

" ' * * * The point is that, in order to constitute a lockout, the conduct of the employer in laying down terms must lead to unemployment inevitably in the sense that the employees could not reasonably be expected to accept the terms and, in reason, there was no alternative for them but to leave their work. * * * ' "

We note that the *Bays/Oriti* definition of a lockout differs from the *Zanesville* definition. According to *Bays/Oriti*, a lockout occurs even if the terms of the employer's unilaterally implemented offer are favorable to the employees if the employer is the first to deviate from the status quo of the pre-existing agreement while negotiations continue. Even after negotiations have ceased, however, *Zanesville* holds that a lockout may occur if the terms of the employer's unilaterally implemented offer are so unfavorable to the employees that they could not reasonably be expected to continue to work under such terms.

In this case, the board of review referee found that the terms of the company's implemented offer were not so unfavorable that the employees could not have reasonably been expected to continue working under the terms. The referee found that "wages under the implemented offer were competitive with wage rates paid by other pulp and paper mills in the midwest." More-

over, the referee found that noneconomic considerations did not play a significant role in the union's decision to strike. Given these facts, the board of review concluded that the work stoppage did not constitute a "lockout" as defined in *Zanesville, supra,* and that the employees were not entitled to unemployment compensation. We conclude that the record supports the board of review's findings in this regard.

Finally, we note that the referee incorrectly interpreted *Oriti* when he found that the employees "accepted" the terms of the company's implemented offer by continuing to work under the company's terms for fifty days, thus creating a "new status quo" which was first changed when the employees went out on strike.

We find nothing in either *Bays* or *Oriti* which would indicate that the term "status quo" refers to anything but that period during which the parties agree to maintain the existing terms and conditions of employment manifested by the pre-existing collective bargaining agreement. Because the status quo is the terms and conditions of the pre-existing collective bargaining agreement, *a priori* the analysis of whether a strike or lockout occurred must take place at that point in time when either party first refuses to continue under the terms of the pre-existing agreement while negotiations continue. We find no support in the law for the proposition that a company's unilaterally implemented final offer can create a "new" status quo in the absence of a newly ratified collective bargaining agreement.

Accordingly, appellants' first assignment of error is sustained.

Given the outcome of this appeal, we need not reach the company's second assignment of error, that Ohio's status quo test, as applied to this case, is preempted by the NLRA.

In light of the foregoing, the judgment of the Montgomery County Court of Common Pleas will be reversed and the decision of the Ohio Unemployment Compensation Board of Review in favor of defendants-appellants will be reinstated.

*Judgment reversed.*

GRADY, P.J., and WOLFF, J., concur.