ALSIP et al., Appellants,

v.

KLOSTERMAN BAKING COMPANY et al., Appellees.

[Cite as *Alsip v. Klosterman Baking Co.* (1996), 113 Ohio App.3d 439.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–950721.

Decided Aug. 14, 1996.

440

*Leonard S. Sigall,* for appellants.

*Graydon, Head & Ritchey, Thomas A. Brennan* and *Daniel E. Burke,* for appellee Klosterman Baking Co., Inc.

*Betty D. Montgomery,* Attorney General, and *David E. Lefton,* for appellee Administrator, Ohio Bureau of Employment Services.

---

MARIANNA BROWN BETTMAN, Presiding Judge.

### I.  Procedural Posture

This is an appeal from the denial of unemployment compensation benefits. The claimants are Timothy Alsip and forty-seven other employees of the Klosterman Baking Company.  They applied for unemployment compensation benefits in connection with a work stoppage which began June 19, 1994.  After a hearing before a hearing officer of the Ohio Bureau of Employment Services ("OBES"), the Administrator of the OBES issued a decision which held that the employees were not entitled to unemployment benefits during the work stoppage.  The Unemployment Compensation Board of Review ("board") affirmed this decision. The claimants appealed to the court of common pleas, which found the decision of the board to be lawful, reasonable and not against the manifest weight of the evidence, and accordingly upheld the denial of benefits.  This appeal ensued. Appellants are the claimants;  appellees are Klosterman and the Administrator of the OBES.

### II.  Facts

Klosterman is a wholesale baker of breads and rolls.  Klosterman and Local No. 57 of the Bakery, Confectionery & Tobacco Workers Union ("Union") had entered into a collective-bargaining agreement ("original CBA") which was in effect from September 1990 through September 25, 1993.  In anticipation of the

expiration of the original CBA, on August 25, 1993, Klosterman and the Union entered into negotiations. The parties met six times before the contract expired. On August 25, 1993, Klosterman submitted a proposal for a one-year contract which included reductions in wages based upon what Klosterman claimed was necessary due to the financial condition of the company.[1] Klosterman unilaterally implemented this proposal on September 24, 1993, one day before the original CBA was due to expire.

During the negotiations, neither party offered or requested to continue operating according to the terms and conditions of the original CBA beyond its expiration date of September 25, 1993. However, the company vice-president testified that when the Union was told that the employer proposal was to be implemented, the Union "suggested that they wanted to continue negotiations, however, they didn't have an economic counter-proposal that was, that warranted, quite frankly."

Although the Union had taken a strike vote and was willing to go out on strike at the expiration of the contract, the union employees worked under the terms of the unilaterally implemented employer proposal continuously from September 25, 1993, until June 19, 1994. There was no evidence in the record that they entered into any written or verbal agreement to do so.

Negotiations between the parties resumed on June 16, 1994. Dissatisfied with the course of negotiations and frustrated with the amount of overtime its members were working, the Union decided to engage in a work stoppage, and so informed the company on June 19, 1994.

Klosterman hired temporary replacement workers and has continued operations. The company at all times has maintained that work was available to union employees under the terms of the employer proposal of September 24, 1993. All the striking employees indicated on their application for determination of unemployment benefits that they expected to return to work at Klosterman.

### III. Legal Analysis

#### A. Standard of Review

█ In their first and third assignments of error, the claimants argue that the trial court abused its discretion in finding the decision of the board lawful, reasonable, and not against the manifest weight of the evidence. Specifically, the

---

1. The company's implemented proposal reduced pay by an average of $2.50 per hour, eliminated the night premium and the Sunday differential, and changed the overtime calculation from over eight hours per day to over forty hours per week. Additionally, employees with seniority of twenty-five years lost one week of vacation and the company's pension contribution was reduced by $.90 per hour.

claimants argue that the trial court erred in failing to find the decision of the board that the claimants are unemployed due to a strike incorrect as a matter of law. Because this is an unemployment compensation administrative appeal, this court now must also review the entire record, giving no deference to the trial court's finding. *Tzangas v. Ohio Bur. of Emp. Serv.* (1995), 73 Ohio St.3d 694, 653 N.E.2d 1207. We will not reverse unless the decision of the board is found to be unlawful, unreasonable, or against the manifest weight of the evidence. R.C. 4141.28(O)(1); *Tzangas, supra.*

## B. Purpose of Unemployment Compensation

■ All parties to this appeal agree that the legal issue around which this case turns is whether the June 19 work stoppage was a lockout. If a work stoppage is due to a lockout, employees are entitled to unemployment compensation. If a work stoppage is due to a labor dispute other than a lockout, there is no right to unemployment compensation benefits.[2] Under the facts of this case and under the law which has developed, this principle is more easily stated than applied. The reason for this is that courts have failed to keep a clear distinction between the law of unemployment compensation and the law dealing with unfair labor practices. In our view, a confusion of the two has resulted in some incorrect interpretations in unemployment compensation cases.[3]

■ The purpose of unemployment compensation is to provide financial assistance to individuals who are able and willing to work, but who find themselves unemployed through no fault of their own. *Salzl v. Gibson Greeting Cards* (1980), 61 Ohio St.2d 35, 39, 15 O.O.3d 49, 51–52, 399 N.E.2d 76, 79. Within the statutory framework of the Unemployment Compensation Act, workers engaged in a work stoppage generally do not qualify for unemployment compensation benefits; however, employees who have been locked out are unemployed through no fault of their own and thus are entitled to such benefits. R.C. 4141.29(D)(1)(a). Therefore, the definition of "lockout" becomes crucial.

The Ohio Supreme Court has approved the definition of a lockout as "a cessation of the furnishing of work to employees or a withholding of work from

---

2. R.C. 4141.28 provides:
"(D) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:
"(1) For any week with respect to which the administrator finds that:
"(a) His unemployment was due to a labor dispute other than a lockout * * *."

3. We are indebted to the analysis in Levy, Unemployment Compensation: The Ohio Supreme Court Rules on the Use of the Status Quo Test for Determining When a Work Stoppage Is Due to a Lockout—*Bays v. Shenango Co.*, 53 Ohio St.3d 132, 559 N.E.2d 740 (1990), 16 U.Dayton L.Rev. 793 (1990), on which we rely in parts of this opinion.

them in an effort to get for the employer more desirable terms." *Zanesville Rapid Transit, Inc. v. Bailey* (1958), 168 Ohio St. 351, 354, 7 O.O.2d 119, 121–122, 155 N.E.2d 202, 205; *Bays v. Shenango Co.* (1990), 53 Ohio St.3d 132, 133, 559 N.E.2d 740, 742. It is interesting that both of these cases approve this definition, because the parties to this action disagree about the effect of the *Bays* decision on the earlier decision in *Zanesville*.

## C. Adoption of Status Quo test

■ In *Bays,* all members of the court approved what is known as the "status quo" test for determining when a work stoppage is due to a lockout. This test was fully developed in the Pennsylvania case of *Erie Forge & Steel Corp. v. Unemp. Comp. Bd. of Review* (1960), 400 Pa. 440, 443–445, 163 A.2d 91, 93–94, commonly known as the Vrotney Unemployment Compensation case (*"Vrotney"*).[4] Under this test, the Administrator and the board must determine " 'which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.' " *Bays, supra,* 53 Ohio St.3d at 135, 559 N.E.2d at 743, quoting *Philco Corp. v. Unemp. Comp. Bd. of Rev.* (1968), 430 Pa. 101, 103, 242 A.2d 454, 455. The union need only offer to continue operations under the status quo for a reasonable period of time pending further negotiations; the employer need only accept the union's offer to continue operations under the status quo for a reasonable period of time pending further negotiations. *Bays* at 134, 559 N.E.2d at 743, citing *Vrotney* at 443–445, 163 A.2d at 93.

We believe that one reason why this test has often been more easily stated than applied is because the appellate court in *Oriti v. Bd. of Rev.* (1983), 7 Ohio App.3d 311, 7 OBR 394, 455 N.E.2d 720, which was the first Ohio court to recognize the status quo test, also erroneously engrafted an economic unreasonableness exception onto the test. According to *Oriti,* an employer may refuse to accept the employees' offer to extend the status quo if "[it] has a compelling reason for failing to so agree such that the extension of the contract would be unreasonable under the circumstances." *Id.* at 314, 7 OBR at 397–398, 455 N.E.2d at 724.

■ While this economic unreasonableness exception is also discussed in *Bays,* we believe it was not adopted by the *Bays* court as part of the status quo test, and properly so. An absolutely crucial part of the Pennsylvania case law on which the *Bays* court relies is the theme that in the context of entitlement to unemployment compensation benefits *the employer's justification for altering the*

---

4. Pennsylvania statutory law on unemployment compensation benefits is virtually identical to Ohio's. Pennsylvania has had an extensive line of case law in the areas of work stoppage and unemployment, to which the Ohio Supreme Court has elected to give great deference.

*status quo should not be considered. Local 730 v. Unemp. Comp. Bd. of Rev.* (1984), 505 Pa. 480, 486–487, 480 A.2d 1000, 1003–1004; *Lee Natl. Corp. v. Unemp. Comp. Bd. of Rev. (Bokosky Unemp. Comp. Case)* (1965), 206 Pa.Super. 96, 105, 211 A.2d 124, 128; Levy, *supra,* at 802. The status quo test is to be objective, not subjective.

In other words, in the application of the status quo test, the *reason* why an employer does not agree to an extension of the status quo is irrelevant. This is wholly appropriate, as a hearing examiner in an unemployment compensation case is not in a position to evaluate the legitimacy of that reason. This is what in our view is the flaw in those cases which use some form of employer economic justification as part of the analysis of the status quo test. These courts are confusing what might be fair in a negotiating session with fault for a work stoppage. This includes *Oriti, supra; Johnson v. Ohio Bur. of Emp. Serv.* (1993), 82 Ohio App.3d 293, 611 N.E.2d 896 (if employer fails to agree to accept employees' offer to extend existing agreement, inquiry focuses on whether employer had compelling reason for failing to agree to extension); and *Zanesville, supra* (dire economic straits of public utility justification for not continuing status quo). Thus, we agree with the claimants that *Zanesville* is either limited to its facts because it involves a public utility, or has been overruled *sub silentio.*

While it is clear from *Bays* that the conduct of both sides, labor and management, will be scrutinized in the application of the status quo test, it is also clear from the court's extensive reliance on *Vrotney* that the *legitimacy of the reasons* for the employer's refusal to extend the status quo is irrelevant in this context.[5] What is especially pertinent from *Vrotney* is that while "an ultimatum laid down by the employer that work will be available only on his (employer's) terms" may be a perfectly legitimate position in a bargaining session before the expiration of the collective-bargaining agreement, it is not a manifestation of a desire to maintain the status quo or an acceptable excuse not to do so.

While the court in *Bays* was unanimous in adopting the status quo test, the justices sharply disagreed in the application of the test to the case before it. What is also clear from the majority in its application of the status quo test is that the pertinent time in which to apply the test is after the collective-bargaining agreement has expired and while new negotiations are in progress. This is crucial to our analysis in this case.

---

**5.** On the other hand, some courts have adopted the "futility" doctrine in scrutinizing the conduct of the employees, holding that if the offer to maintain the status quo would be futile, the employees need not make such an offer and they will not be deemed to have refused to extend the status quo. *Philco, supra,* 430 Pa. at 104, 242 A.2d at 456. This is not, as it may seem at first blush, a double standard for employers and employees. It is a recognition of the fact that the employees have the burden of proving that the work stoppage was through no fault of their own in order to qualify for benefits.

#### D. Application of Status Quo Test to Klosterman Work Stoppage

The quirk in this case is that after the original CBA expired, neither side immediately offered to continue working under the old conditions. Instead, on September 24, 1993, the day before the original CBA expired, Klosterman unilaterally implemented its employer proposal, and the union workers voluntarily worked under the terms and conditions of this proposal until June 16, 1994. At *that* time negotiations resumed. The administrative record contains testimony from a union official that at this time the Union offered to resume work under the original CBA while negotiations continued. However, the record also contains testimony that Klosterman considered this an offer for a new contract and not an offer to continue working under the status quo (the original CBA). Klosterman refused this offer.

Negotiations broke down after a few sessions and a work stoppage occurred on June 19, 1994. That is the date on which the claimants argue they were locked out, and thus entitled to unemployment compensation benefits.

The hearing officer found that when Klosterman implemented its unilateral offer the day before the original CBA expired, a new status quo was created. He then applied the *Bays* test to the new status quo, and found that it was the employees who refused to continue working under the status quo; thus, the work stoppage was other than a lockout, and the claimants were not entitled to benefits. This analysis is erroneous and contrary to law.

■ We agree with our colleagues in *Johnson, supra,* to the extent that they held that there is no support in law "for the proposition that a company's unilaterally implemented final offer can create a 'new' status quo in the absence of a newly ratified collective bargaining agreement." *Id.,* 82 Ohio App.3d at 300, 611 N.E.2d at 901. See, also, *Local 730, supra,* 505 Pa. at 488–489, 480 A.2d at 1004–1005. The *Johnson* court further said:

"We find nothing in either *Bays* or *Oriti* which would indicate that the term 'status quo' refers to anything but that period during which the parties agree to maintain the existing terms and conditions of employment manifested by the pre-existing collective bargaining agreement. Because the status quo is the terms and conditions of the pre-existing collective bargaining agreement, *a priori* the analysis of whether a strike or lockout occurred must take place at that point in time when either party first refuses to continue under the terms of the pre-existing agreement while negotiations continue." 82 Ohio App.3d at 300, 611 N.E.2d at 901.

The reason for this should be apparent. The entire point of preserving the status quo is that it has already been bargained for by both sides. In another of the Pennsylvania cases which have formed so much a part of Ohio precedent in this area of law, *Fairview School Dist. v. Unemp. Comp. Bd. of Rev.* (1982), 499 Pa. 539, 454 A.2d 517, the rationale for the status quo requirement is clearly stated, namely, that during the period between contracts the employer may continue operations and the employees may continue working while both sides continue to negotiate in good faith. *Id.* at 546–547, 454 A.2d at 521.

*Bays* also requires that the status quo test must be applied while negotiations are ongoing. *Bays*, 53 Ohio St.3d at 135, 559 N.E.2d at 743, quoting *Philco*, 430 Pa. at 103, 242 A.2d at 455. From September 24, 1993, the day Klosterman unilaterally implemented its employer proposal until June 16, 1994, when the parties returned to the table, there were no negotiations going on. Thus, we hold that the period of time between September 24, 1993 and June 16, 1994, when negotiations resumed, is of no legal consequence as far as the analysis of this case is concerned. The status quo was temporarily abandoned by both sides. Negotiations were not ongoing. This was nothing more than a brief period in which the employees worked under reduced terms. Additionally, no unemployment compensation benefits are being sought for this period. Accordingly, the board's decision is contrary to law. Therefore, the first and third assignments of error are sustained.

## E.   Exclusion of Evidence

In their second assignment of error, the claimants argue that the Administrator and the board erroneously ruled irrelevant and inadmissible complaints issued by the National Labor Relations Board ("NLRB") against Klosterman based upon unproven allegations by the union. As we discussed above, a hearing officer from the Bureau of Employment Services cannot evaluate the behavior of the union and the employer according to the National Labor Relations Act. Federal labor law does not apply and confuses the relevant focus of the hearing officer's inquiry: "Are the employees unemployed through no fault of their own?" The complaints were correctly ruled irrelevant and inadmissible by the hearing officer. The second assignment of error is overruled.

## IV.   Conclusion

We hold, based on the foregoing analysis, that the decision of the board was contrary to law, and the judgment of the trial court upholding that decision is

accordingly reversed. We hereby enter the judgment that should have been entered in the trial court: the board's decision is vacated and the matter is remanded to the board for a proper application of the status quo test in *Bays*. We reemphasize that our decision is based only on Ohio's unemployment compensation law and is unrelated to any other labor issues among the parties. The *Bays* test in this case must be applied to the status quo which existed before the original CBA expired, and it must be applied to the time when negotiations resumed on June 16, 1994. Further, the status quo test is to be applied without reference to the employer's economic circumstances.

*Judgment accordingly.*

PAINTER, J., concurs.

DOAN, J., dissents.

DOAN, Judge, dissenting.

I have no qualm with the majority's analysis of the general law regarding the status quo continuation of employment. The honest disagreement I have is that the majority has misconstrued the facts of this case.

The vote to strike was taken in late September 1993, not June 16, 1994. Thus, the strike vote action was taken when no negotiations were ongoing and there was no offer from the union to continue operations under the status quo. I must therefore conclude that after the September 1993 strike vote, the employees went to work under new terms which they accepted because the union had not offered a status quo continuance of work. I reason that the employees individually, and as a union, waived the necessary prerequisite conditions to continue employment at the status quo. It is not credible to determine that new negotiations some nine months later between the company and union can somehow bootstrap these facts to a status quo implementation of employment.

The union-company relationship was waived in late September 1993 and was nonexistent in June 1994. The negotiations in June 1994 must therefore be viewed as negotiations to organize the employees into a union shop once again with a newly proposed contract.

I would affirm the determination of the trial court.