OPINION
Appellee, ANR Advance Transportation Co. ("ANR"), a Milwaukee, Wisconsin based freight hauling service with terminals in Akron, Cincinnati, Cleveland, Columbus, Dayton and Toledo, employed appellant Fred Aliff and approximately two hundred forty other members of the International Brotherhood of Teamsters ("the Union"). The Union represented bargaining unit employees (drivers, dock workers, garage and clerical employees) at all six of ANR's Ohio terminals.
ANR and the Union were parties to a collective bargaining agreement that expired on March 31, 1998. ANR attempted to open negotiations early (in the summer of 1997) due to its precarious financial situation; however, the Union delayed negotiations until August 1998, after the National Master Freight Agreement between the International Brother of Teamsters and the multi-employer bargaining committee had been ratified. After the contract expired but while negotiations proceeded toward a new contract, the parties agreed to work under the terms and conditions of the expired agreement. Between August and November 1998, nine bargaining sessions were held. At the last of these bargaining sessions, on November 16, 1998, ANR made a final contract offer. The offer proposed a five-year wage freeze with increasing annual bonus payments; an increased deductible for heath insurance; a decrease (from ninety percent to seventy-five percent) in the percentage of active employees guaranteed forty hours work per week; a change in the calculation of overtime, sick leave and vacation benefits; and the use of part-time workers. The Union rejected the final offer and, according to Mel Nensel, ANR's Vice President of Labor Relations and chief labor negotiator, no further negotiations took place. Nevertheless, work continued under the terms of the expired contract until December 7, 1998, when ANR unilaterally implemented the final offer it had made on November 16, 1998. On December 8, 1998, picket lines were set up at the various terminals, and appellants did not report for work.
ANR hired no replacement workers and did not make any shipments after appellants went on strike because no customers would ship with ANR. As a result, ANR, on December 14, 1998, issued WARN (Workers Adjustment Retraining Notification) notices advising the Union that there would be a mass layoff as of February 13, 1999. In response, on December 18, 1998, the Union negotiating committee advised all local unions to cease picketing, as there was no evidence that ANR planned to resume its operations. The Union notice to its members advising them to remove their pickets signs left open the possibility of further picketing should ANR attempt to resume operations. According to Mr. Nensel, as of the date of the January 11, 1999 hearing, the Union had not notified ANR that it was ending the work stoppage and offering to return to work.
According to Nick Haschka, a Union representative, and Marlene Utzinger, a clerical employee and Union strike captain, some Cleveland and Columbus employees offered to return to work on December 21, 1998, but were told by management personnel that there was no work available. On December 22, 1998, ANR issued a memorandum to its terminal managers instructing them that anyone who attempted to return to work should be told that ANR had not been notified that the strike was over and that there was no work available due to the strike. ANR never resumed operations after December 8, 1998.
Thereafter, appellants applied for unemployment compensation benefits in connection with the work stoppage. The matter was referred to a hearing officer of the Ohio Bureau of Employment Services.[1] A hearing was conducted on January 11, 1999. On January 29, 1999, the hearing officer issued a decision finding that appellants were not entitled to receive unemployment compensation benefits because their unemployment was due to a "labor dispute other than a lockout" beginning on December 8, 1999. On February 17, 1999, appellants filed an application for appeal before the Unemployment Compensation Review Commission ("Review Commission"), which was ultimately disallowed. While the appeal application was pending, the hearing officer, on March 3, 1999, entered an "Order Regarding Ending Date of Labor Dispute" in which it was determined that the labor dispute ended February 8, 1999. It is undisputed that no appeal was taken from the March 3, 1999 order.
Appellants appealed the decision of the Review Commission to the Franklin County Court of Common Pleas. On December 4, 2000, the common pleas court entered judgment affirming the Review Commission's decision, finding it to be lawful, reasonable, and not against the manifest weight of the evidence. Appellants have appealed to this court, assigning the following error for our review:
 The common pleas court abused its discretion in denying the appellants' appeal and affirming the review commission's denial of unemployment compensation benefits.
At the outset, we note the standard of review applicable to unemployment compensation cases. R.C. 4141.28(O)(1) states that any interested party may appeal from a decision of the Review Commission to the court of common pleas, and the court of common pleas may reverse or modify such decision only if it finds the decision was unlawful, unreasonable or against the manifest weight of the evidence. The same standard applies to this court's review. Tzangas, Plakas Mannos v. Ohio Bur. Of Emp. Serv. (1995), 73 Ohio St.3d 694, 696. In so reviewing, however, the Review Commission's role as factfinder remains intact, and the fact that reasonable minds may reach different conclusions is not a basis for reversing the Review Commission's decision. Id. at 697. An appellate court may not make factual findings or assess the credibility of witnesses and may determine only whether the evidence supports the Review Commission's decision. Id. at 696-697.
All parties to this appeal agree that the main issue to be decided by this court involves a question of law, specifically, whether or not appellants' unemployment was due to a lockout or a labor dispute other than a lockout. The evidence in the instant case reveals that appellants became unemployed on December 8, 1998, when they began picketing the ANR terminals and did not report for work. R.C. 4141.29(D)(1)(a) provides that no individual is entitled to unemployment compensation benefits for any week during which their unemployment is due to a labor dispute other than a lockout. Thus, in order to determine whether appellants are entitled to benefits, it must be determined whether the labor dispute was or was not a lockout within the meaning of the Ohio unemployment compensation law.
In Zanesville Rapid Transit, Inc. v. Bailey (1958), 168 Ohio St. 351, the Ohio Supreme Court first addressed the issue of what conditions create a lockout. The court defined a "lockout" as "a cessation of the furnishing of work to employees or a withholding of work from them in an effort to get for the employer more desirable terms." Id. at 354. The court further stated that if modifications in working conditions are reasonable, employees would be expected to continue work. Id. Failure to work under reasonably acceptable conditions would not constitute a lockout. Id. The court noted, however, that the converse is also true. Where an employer offers its employees unreasonable conditions of continued employment, an employee's failure to accept those conditions would not constitute a strike. Id. In summary, the court stated:
 "*** The real test whether the imposition by the employer of changed conditions of employment is a withholding of work so as to constitute a lockout lies in the question whether the conditions imposed are such that his employees could not be expected to continue work under them and, in reason, they had no other course open to them but to leave their employment." [Id. at 355, quoting Almada v. Administrator, Unemployment Compensation Act, 137 Conn. 380, 77 A.2d 765, 771.]
In Zanesville, the employer implemented a ten percent wage reduction after the labor agreement expired. The employer, a public utility, had experienced problems making a profit and had been unable to gain permission from the city council to increase fares. The court held that a ten percent wage reduction was not unreasonable under the circumstances and did not manifest a purpose on the part of the employer to coerce the employees into accepting it. Importantly, the court noted that the request to continue work at reduced wages was not made unexpectedly or without any opportunity for prior negotiations. The court further noted that prior to the expiration of the labor agreement, the union had been made aware of the employer's distressed circumstances and of its announced intention not to continue the contract.
While the court's focus in Zanesville was on whether the employer imposed unreasonable conditions on employees which left them no alternative but to cease working, the court, in Bays v. Shenango Co. (1990), 53 Ohio St.3d 132, adopted another analysis, the so-called "status quo" test, to determine whether a labor dispute is considered a strike or a lockout. Quoting the test developed in Erie Forge Steel Corp. v. Unemploy. Comp. Bd. of Review (1960), 400 Pa. 440, 443-445,163 A.2d 91, 93-94, the Ohio Supreme Court stated:
 "*** [T]he sole test under *** the Unemployment Compensation Law *** of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a `lockout' and the disqualification of unemployment compensation benefits in the case of a `stoppage of work because of a labor dispute' does not apply." [Bays, supra, ar 134-135.]
The "status quo" test therefore requires a determination of "which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." Id. at 135, quoting Philco Corp v. Unemp. Comp. Bd. of Review (1968), 430 Pa. 101, 103, 242 A.2d 454, 455.
Appellants herein contend that both the hearing officer and the common pleas court erred as a matter of law in applying the "reasonableness" test set forth in Zanesville, supra, rather than the "status quo" test set forth in Bays, supra, to the instant case. We do not agree. In our view, Bays, by its own terms, compels application of the "status quo" test only where negotiations between the parties are ongoing at the time the employer implements its final offer. The same conclusion has been reached by the Montgomery County Court of Appeals in Johnson v. Ohio Bur. Of Emp. Serv. (1993), 82 Ohio App.3d 293. In that case, the court determined that the test set forth in Zanesville should be applied to determine whether a work stoppage is due to a lockout in instances where negotiations have ceased. According to Johnson, if the relationship between the parties has broken down to the point where meaningful negotiations have ceased, then under Bays, the employer does not deviate from the status quo when it implements its final offer. Id. at 298. Whether the work stoppage is a strike or a lockout then depends upon the Zanesville definition of a lockout, which looks at the reasonableness of the implementation of the final offer. The court explained:
 In this case, the record clearly establishes that the company reasonably believed that impasse had been reached when it unilaterally implemented its final offer on July 8, 1985. While the company was clearly the first party to "blink" in this labor dispute, the record supports the conclusion that that meaningful negotiations were no longer "continuing" at the time the company implemented the terms of its final offer. Therefore, according to the dictates of the Bays/Oriti analysis, the company did not deviate from the status quo because negotiations were no longer "continuing" when it implemented its final offer. Thus, the referee's determination of whether the work stoppage was a strike or a lockout properly could be made with reference to the definition of a "lockout" contained in Zanesville ***. [Id. at 298-299.]
Applying the Zanesville definition of "lockout," the Johnson court affirmed the Review Commission's finding that the terms of the employer's implemented offer were not so unreasonable that the employees could not reasonably have been expected to continue working under them. Id. at 295. In our view, the same result is compelled in the instant case. The hearing officer determined that negotiations had ceased before ANR unilaterally implemented its final offer on December 7, 1998. Specifically, the hearing officer found that "[c]ontract negotiations were not continuing at the time the work stoppage began." This finding is supported by the record. As noted previously, Mr. Nensel testified that no further negotiations took place after the Union rejected ANR's final offer on November 18, 1998. Accordingly, we find that the hearing officer did not err in finding that the test set forth in Zanesville should be applied to the facts of the instant case.
As to the reasonableness of ANR's implemented offer, the hearing officer noted that ANR implemented its final offer only after attempting to negotiate with the Union for more than eighteen months. In addition, the evidence establishes that over that eighteen-month period, Union negotiators were made aware that ANR was experiencing serious financial difficulties. We further note that the hearing officer correctly set forth the terms and conditions of ANR's final offer. The hearing officer determined that "the terms and conditions of employment imposed by the employer on December 7, 1998 were not so unfavorable as to leave the employees no alternative but to strike." Such determination is clearly within the purview of the hearing officer as factfinder.
Appellants also contend that the Union's removal of pickets on December 18, 1998, and the Union's offer to return to work on December 21, 1998, terminated the labor dispute. By this argument, appellants apparently seek to contest the hearing officer's March 3, 1999 order, wherein it was determined that the labor dispute ended on February 8, 1999, when the Union unconditionally offered to return to work. Upon review of the record, we find that appellants did not appeal the March 3, 1999 order to the Review Commission. According to R.C. 4141.28(D)(1)(c), a hearing officer's decision is final unless an application for appeal is filed with the Review Commission within twenty-one days. Appellants concede in their brief that an appeal of the March 3, 1999 decision was never filed with the Review Commission. As appellants failed to exhaust their administrative remedies with regard to this issue, it may not be raised before this court. See Noernberg v. Brook Park (1980), 63 Ohio St.2d 26.
Assuming arguendo that a timely appeal had been filed, we find that the record supports the hearing officer's order. Appellants argue that the Union's removal of pickets on December 18, 1998, and the December 21, 1998 offer to return to work terminated the labor dispute. The record demonstrates, however, that the labor dispute did not end with these two events. In the March 3, 1999 order, the hearing officer noted that he had reviewed information received from the Union indicating that on February 8, 1999, it offered to return to work unconditionally. The hearing officer indicated that he found this information to be both reliable and credible. Appellants point to no evidence contradicting this finding.
Further, as found by the hearing officer in his January 29, 1999 decision, the Union on December 18, 1998, advised the locals to remove the pickets, but the withdrawal was conditional. The Union advised appellants that the removal of pickets was due to the fact that there was no evidence that ANR was attempting to resume its operations, but counseled its members to resume picketing if ANR attempted to resume its operations. According to testimony from Ms. Utzinger, she understood that the Union would resume the strike if ANR tried to implement the contract. The hearing officer further found that several Union members attempted to return to work on December 21, 1998, but were denied entrance to the terminals. The evidence establishes that ANR posted memoranda at all terminals stating that ANR had not been notified that the strike was over. Contrary to appellants' assertion, no evidence demonstrates an unconditional offer to return to work by the Union on either December 18 or 21, 1998.
Finally, we address appellants' contention that Union clerical and garage employees should be granted unemployment compensation benefits from December 7, 1998 forward because ANR deviated from the status quo when it implemented its final offer. The basis for this argument is that these employees negotiate their agreements with ANR separately and that those bargaining units had not yet begun to negotiate their contract. We find no merit to this argument.
While the hearing officer did not specifically address this issue, testimony from Mr. Nensel establishes that the negotiations between ANR and the Union covered all bargaining unit employees, and that the clerical/garage employee agreements are merely addenda to the local cartage agreement, which covers the drivers and dock workers. According to Mr. Nensel, although a few of the terms and conditions of the clerical/garage employee agreements differ from those of the driver/dock worker agreement, the differences are limited only to employee classifications, hourly wages and the type of work involved. In all other respects, the clerical/garage employees are covered under the local cartage agreement. Accordingly, we conclude that benefits were properly denied to the clerical/garage employees under the circumstances.
In conclusion, we find that the Review Commission's decision that appellants' unemployment was due to a labor dispute other than a lockout and the subsequent denial of benefits was not unlawful, unreasonable or against the manifest weight of the evidence. Accordingly, appellants' sole assignment of error is not well-taken.[2]
For the foregoing reasons, the assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
DESHLER and BROWN, JJ., concur.
[1] Pursuant to Am.Sub.H.B. 470 and 471, effective July 1, 2000, the former Ohio Bureau of Employment Services was merged into a newly created agency, the Ohio Department of Job and Family Services.
[2] Similar cases involving the parties herein were filed in Cuyahoga, Hamilton, Lucas, Montgomery and Summit Counties. As in Franklin County, the common pleas courts in Hamilton and Montgomery Counties have ruled in favor of appellee. The Hamilton County Court of Appeals affirmed the common pleas court's decision in Aliff v. Ohio Bur. of Emp. Serv. (Mar. 9, 2001), Hamilton App. No. C-000238, unreported. A discretionary appeal to the Ohio Supreme Court was not allowed. See Aliff v. Ohio Bur. Of Emp. Serv. (2001), 92 Ohio St.3d 1433. Neither party has made this court aware of any other decisions issued in the remaining counties.