OPINION
Plaintiff, Fred E. Aliff, and approximately 180 other former employees of ANR/Advance Transportation Company ("ANR") appeal from a denial of unemployment compensation benefits they sought. The claims were denied, and are opposed on appeal, by the Ohio Bureau of Employment Services ("OBES").
ANR is in the business of hauling freight. ANR operated six terminals in Ohio until February 1999. Appellants are former employees of ANR who worked at the Ohio Terminals. Appellants are, or were, represented under a collective bargaining agreement between the International Brotherhood of Teamsters ("the Union") and ANR.
The previous collective bargaining agreement between the Union and ANR, which was for a term of three years, expired on March 31, 1998. Its provisions continued in effect until a new contract was signed. Citing continuing financial problems, ANR asked to begin negotiations for a new agreement in the summer of 1997. Bargaining did not begin until August 1998, after the union had ratified the National Master Freight Industry Agreement. In the meantime, the parties continued to operate under the prior agreement.
Between August and November 1998, ANR and the Union engaged in nine bargaining sessions. On November 16, 1998, ANR made what it termed its "final offer." The offer included a five-year wage freeze, which was supplemented by a bonus structure. The percentage of the employees working full-time was diminished from ninety percent to seventy-five percent, and more part-time employees could be hired. The final offer included a change in the health care coverage, resulting in a higher deductible payment by employees. The offer changed the overtime structure from overtime after eight hours in a day to overtime after forty hours in a week. The offer also altered the calculation of sick leave, vacation pay, and holidays. Under the offer, ANR could hire other carriers for one-way trips. Finally, ANR proposed numerous amendments to the work rules.
The Union attempted to avoid implementation of the final offer and asked ANR to return to the bargaining table. On December 1, 1998, ANR rejected the Union's request and indicated that the company would proceed unilaterally to implement the terms of its final offer on December 7, 1998. On December 2, 1998, the Union Negotiating Committee notified local chapters of the employer's intentions, and instructed them to hold meetings on December 5-6 to review the final offer and to take a strike vote.
ANR implemented the terms of the final offer on December 7, 1998. The Union authorized a strike to begin at 12:01 a.m. the following day. Instead of reporting for work on December 8, 1998, the employees set up picket lines in front of ANR's terminals. ANR did not hire replacement workers and did not transport any freight during the strike. On December 13, 1998, ANR issued notices under the Workers Adjustment Retraining Notification Act, advising the Union of the possibility of mass layoffs or closing effective February 13, 1999.
On December 18, 1998, the Union Negotiating Committee advised the members to remove their pickets because there was no evidence that ANR would resume operations. On December 21, 1998, a local Union representative orally notified an ANR terminal manager that the strike was over. A few employees attempted to return to work on December 21, 1998, but were told that the strike was still on and that there was no work. On February 8, 1999, the Union sent ANR notice that it considered the strike to have ended on December 18, 1998, when the picketing had ceased.
The members of the Union applied for unemployment compensation benefits for the time they were off work. The Ohio Bureau of Employment Services ("OBES") consolidated the claims for unemployment compensation of all affected workers, and a hearing on the claims was held on January 11, 1999. The Bureau issued a decision on January 29, 1999, denying unemployment benefits. OBES later issued supplemental decisions denying the claims of additional claimants. OBES subsequently issued an order regarding the ending day of the labor dispute, finding that the strike had ended on February 8, 1999. This order was not appealed.
On August 30, 1999, the Unemployment Compensation Review Commission denied the claimants' applications for appeal of the OBES decisions. On November 16, 1999, the claimants filed a notice of appeal with the Montgomery County Common Pleas Court on the denial of unemployment compensation. The Court of Common Pleas upheld the findings of the OBES hearing officer and review board in a decision issued November 29, 2000.
Claimants filed a timely notice of appeal to this court. They present one assignment of error.
 THE COMMON PLEAS COURT ABUSED ITS DISCRETION IN DENYING THE APPELLANTS' APPEAL AND AFFIRMING THE REVIEW COMMISSION'S DENIAL OF UNEMPLOYMENT COMPENSATION BENEFITS
We must first dispose of a matter raised at oral argument and subsequently argued in supplemental briefs.
OBES argued that res judicata bars determination of the issue presented because another appellate court has ruled upon the issue in a companion case. See Aliff v. Ohio Bur. of Emp. Serv. (March 9, 2001), Hamilton App. No. C-000238, unreported. The employees argue that OBES waived the right to invoke the doctrine because the issue was never raised in the trial court. The employees argue that, as a matter of fact, OBES successfully opposed a motion to consolidate the cases in the Franklin County Court of Common Pleas.
"[T]he fundamental rule is that an appellate court will not consider any error which could have been brought to the trial court's attention, and hence avoided or otherwise corrected." Schade v. Carnegie Body Co. (1982), 70 Ohio St.2d 207, 210. See Heinz v. Steffen (1996),112 Ohio App.3d 174. In addition, failure to join and consolidate all parties in privity in an action constitutes waiver. Nationwide Ins. Co.v. Steigerwalt (1970), 21 Ohio St.2d 87. Therefore we find that the employees appeal is not barred by res judicata and we proceed to address it directly.
R.C. 4141.28(O)(1) provides for judicial review of a decision denying unemployment compensation benefits. "[A] reviewing court may reverse the board's determination only if it is unlawful, unreasonable, or against the manifest weight of the evidence." Tzangas, Plakas Mannos v. OhioBur. of Emp. Serv. (1995), 73 Ohio St.3d 694, 697.
"[W]hile appellate courts are not permitted to make factual findings or to determine the credibility of witnesses, they do have the duty to determine whether the board's decision is supported by the evidence in the record." Id. at 696.
The purpose of the Ohio Unemployment Compensation Act is "to ameliorate the burdens on employees suffering from involuntary unemployment and to provide them with short-term financial relief." Abate v.Wheeling-Pittsburgh Steel Corp. (1998), 126 Ohio App.3d 742, 748 (citingBaker v. Powhatan Mining Co. (1946), 146 Ohio St. 600). Both parties carry a burden of proof as to whether claimants are entitled to unemployment compensation: the claimant has the initial burden of proving a right to compensation, and the employer must prove any claimed exception to that right. Id.
It is undisputed that Defendant-Appellant Aliff and the other former employees of ANR have a claim for benefits. The issue presented is whether by undertaking a strike action they have created an exception to their claim.
R.C. 4141.29 provides the circumstances under which an individual will be denied unemployment compensation and states, inter alia:
 (D) Notwithstanding division (A) of this section, no individual may serve a waiting period or be paid benefits under the following conditions:
 (1) For any week with respect to which the administrator finds that:
 (a) His unemployment was due to a labor dispute other than a lockout at any factory, establishment, or other premises located in this or any other state and owned or operated by the employer by which he is or was last employed; and for so long as his unemployment is due to such labor dispute. . . . (Emphasis added).
Thus, much of the jurisprudence in this area involves defining what, exactly, constitutes a lockout.
In Zanesville Rapid Transit, Inc. v. Bailey (1958), 168 Ohio St. 351, the Supreme Court of Ohio adopted the Connecticut definition:
 The imposition by the employer of changes in working conditions or wages, even though they deprive the employees of some advantage they already possess, does not necessarily constitute a lockout. Changes in the terms of employment might still be such that under all the circumstances the employees would be expected in reason to accept them rather than quit work. To constitute a lockout . . . the conditions of further employment announced by the employer must be such that the employees could not reasonably be expected to accept them and they must manifest a purpose on the part of the employer to coerce his employees into accepting them or some other terms . . .
 . . . The point is that, in order to constitute a lockout, the conduct of the employer in laying down terms must lead to unemployment inevitably in the sense that the employees could not reasonably be expected to accept the terms and, in reason, there was no alternative for them but to leave their work. The real test whether the imposition by the employer of changed conditions of employment is a withholding of work so as to constitute a lockout lies in the question whether the conditions imposed are such that his employees could not be expected to continue work under them and, in reason, they had no other course open to them but to leave their employment.
Id. at 354-55 (quoting Almada v. Administrator, Unemployment CompensationAct (1951), 137 Conn. 380, 389-91, 77 A.2d 765, 771).
The Zanesville definition of a lockout focuses on the reasonableness of the employer's unilaterally implemented offer. If the terms of the offer "are so unfavorable to the employees that they could not reasonably expected to continue to work under such terms," then a lockout has occurred. Johnson v. Ohio Bur. of Emp. Serv. (1993), 82 Ohio App.3d 293,299.
However, in Bays v. Shenengo Co. (1990), 53 Ohio St.3d 132, the court adopted the "status quo" test:
 [T]he sole test under . . . the Unemployment Compensation Law, . . . of whether the work stoppage is the responsibility of the employer or the employees is reduced to the following: Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the pre-existing terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout" and the disqualification of unemployment compensation benefits in the case of a "stoppage of work because of a labor dispute" does not apply.
Id. at 134-35 (quoting Erie Forge Steel Corp. v. Unemp. Comp. Bd. ofReview (1960), 400 Pa. 440, 443-45, 163 A.2d 91, 93-94).
The status quo test requires a court to scrutinize the actions of both the employer and the union representing its employees to determine which side "first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing." Id. at 135 (quoting Philco Corp. v. Unemp. Comp. Bd. ofReview (1968), 430 Pa. 101, 103, 242 A.2d 454, 455).
We attempted to illuminate the distinctions between Zanesville andBays in Johnson v. Ohio Bur. of Emp. Serv. (1993), 82 Ohio App.3d 293. First, we announced that several questions were important when determining whether the work stoppage was due to a strike or a lockout under the "status quo" test:
 (1) Did the employees manifest an intention to maintain the status quo by offering to continue working for a reasonable time under the terms of the existing agreement; (2) did the employer agree to maintain the status quo by allowing the employees to continue working for a reasonable time under the existing agreement; (3) if the employer fails to agree to accept the employees' offer to extend the existing agreement, did the employer have a compelling reason for failing to agree such that an extension would be unreasonable under the circumstances; (4) when either party first refused to continue under the status quo, had a "reasonable" period of time elapsed between the agreement to maintain the status quo and the subsequent refusal to continue thereunder; and (5) when either party first refused to continue under the status quo, were negotiations "continuing" or had the relationship of the parties broken down to the point where meaningful negotiations had ceased, e.g., such as where a lawful impasse had been reached.
Id. at 297.
The fifth question in the Johnson test is crucial, because the Bays
definition of a lockout applies only where negotiations are "continuing" when the final offer is implemented. Id.Id. See Bays, supra, at 135. If before that an "impasse" has been reached, then the Bays "status quo" analysis no longer applies and the prior Zanesville definition applies.Johnson, supra.
An impasse is defined as "the deadlock reached by bargaining parties after good-faith negotiations have exhausted the prospects of concluding an agreement." E. Cleveland v. E. Cleveland Firefighters Local 500
(1994), 70 Ohio St.3d 125, 130 n. 1 (quoting Teamsters Local Union No.175 v. Nat'l Labor Relations Bd. (C.A.D.C. 1968), 788 F.2d 27, 30).
In Johnson, the company proposed a final offer in late May, 1985. While the offer included a $1,000,000 concession from the employer's previous offer, the parties' positions remained approximately $8,100,000 apart. The Union unanimously rejected the final offer. The company interpreted the negotiations to be at an impasse and implemented the final offer on July 8, 1985. The Union filed a complaint with the National Labor Relations Board, but the employees continued to work under the unilaterally implemented offer for seven weeks, until the employees went on strike while the company was overhauling their machinery. We found that "the record clearly indicates that the company reasonably believed that impasse had been reached when it unilaterally implemented its final offer," and held for the employer.
Here, the trial court found that the record clearly indicates that ANR reasonably believed that an impasse had been reached when it unilaterally implemented its final offer on December 7, 1998. While ANR was clearly the first to discontinue operations under the expired contract, and [sic] there is evidence in the record to support the conclusion that negotiations had ceased when the final offer was implemented.
The trial court does not identify the evidence on which it relied to find that an impasse had occurred. A similar omission is found in the decision of the hearing officer, who stated simply that "[c]ontract negotiations were not continuing at the time the work stoppage began."
Under Johnson, we measure whether an impasse has occurred as of the point in time immediately before the terms of the final offer are implemented. Our review of this record reveals no evidence that an impasse had then occurred, such as a sizeable difference between the parties' contract offers or an extended period of time without negotiation, as we saw in Johnson.
The parties met nine times to negotiate the new contract between August 1998 and November 1998. ANR's "final offer" was put on the table on November 16, 1998, but no implementation date was announced. Nick Haschka, a business representative of the Union, testified that "a week or two prior" to implementation, ANR informed the negotiators that the terms of the final offer would be unilaterally implemented on December 7, 1998. Haschka testified that it was his understanding that after the negotiators were notified of the implementation date, the negotiators presented a counter proposal that the company rejected.
In a December 2, 1998, electronic mail sent by the Union Negotiating Committee to its local officers, the Union stated that it had requested the company to "stop the implementation of the company's offer and return to the bargaining table during the week of December 7, 1998 for further negotiations." The e-mail reported that the company's president rejected this request on December 1, 1998, and the president then indicated that the company would implement the terms of the final offer on December 7, 1998.
ANR presented its final offer to the Union on November 16, 1998. The Union asked for another bargaining session, but ANR's president rejected that request on December 1, 1998, only two weeks after the "final offer" was presented. ANR then implemented its final offer, unilaterally, on December 7, 1998. The record of these events fails to clearly demonstrate that an impasse had been reached when ANR unilaterally implemented its final offer. Good-faith negotiations had not exhausted the prospects of reaching an agreement, so as to produce a deadlock. E. Cleveland, supra. Measured objectively, the record does not demonstrate that ANR reasonably believed that an impasse had been reached when it implemented its final offer. Were we to find an impasse here, then every time an employer made a final offer it could refuse to negotiate further, declare an impasse and then implement the final offer, knowing that it would not be held to the Bays standard. We believe that situation would run counter to the balance struck, and the goals intended, by the unemployment compensation statute.
The trial court applied the Zanesville definition when it upheld the hearing officer's decision denying unemployment benefits to the claimants. However, we find that the Bureau has failed to present competent, credible evidence that an impasse existed. Therefore, we hold that the trial court erred when it applied an improper standard of law. The Bays status quo test should have been applied.
Applying the Bays test, it is clear that no impasse existed when ANR implemented its final offer unilaterally on December 7, 1998. Therefore, that action was a constructive lockout. Per R.C.4141.29(D)(1(a), a lockout is not a form of "labor dispute" that disqualifies an employee affected by it from receiving unemployment compensation benefits. Aliff and the other employees of ANR affected by the lockout are entitled to receive unemployment compensation benefits for the period commencing December 7, 1998, therefore. The pendency of the constructive lockout rendered the subsequent strike immaterial to their right to benefits, even though the strike commenced the following day, December 8, 1998. Had those events occurred in reverse order, the result would be different.
Under the assignment of error the employees also argue that the work stoppage ended on December 18, 1998, the day that the pickets were removed, and that the clerical and garage employees should be granted unemployment compensation because their contract is negotiated separately. These claims present issues which are rendered moot by our determination.
 Conclusion
The Union's strike beginning December 8, 1998, was not a basis for denying unemployment compensation pursuant to R.C. 4141.29(D)(1)(a). Therefore, the assignment of error is sustained. We will reverse the judgment of the Montgomery County Court of Common Pleas and remand for further proceedings not inconsistent with this opinion.
FAIN, J. and YOUNG, J., concur.